## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA
## AT WHEELING

| | | |
|---|---|---|
| **MAURA ANNE KREITZER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO. 5:22-cv-312** |
| **vs.** | : | |
| | : | **Judge Bailey** |
| **SAFECO INSURANCE COMPANY OF** | : | |
| **AMERICA, a Liberty Mutual Company,** | : | |
| **LIBERTY MUTUAL INSURANCE** | : | |
| **COMPANY and MARISA CULBERTSON** | : | |
| | : | |
| **Defendants.** | : | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now come Safeco Insurance Company of America ("Safeco"), Liberty Mutual Insurance Company ("Liberty") and Marisa Culbertson ("Culbertson") (collectively, "Defendants"), by and through counsel, and offer the below in response to Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion").(ECF No. 69.)  Plaintiff's Motion takes the tack that if Plaintiff (or more likely, her counsel) makes up and misrepresents enough "facts," perhaps the Court will be tricked into either believing them or throwing up its hands and deeming trial necessary.  Defendants urge the Court not to be fooled, and to instead recognize this case for what it is – a good faith dispute as to the value of an insurance claim which the parties subsequently settled based on drastically different damages information presented two years into the lawsuit.  Plaintiff is not entitled to summary judgment in this action; Defendants are.[1]

---

[1] In an effort to streamline this Court's review and conserve the Court's resources by not re-articulating the same arguments expressed in Defendants' previous filing, Defendants incorporate by reference their Motion for Summary Judgment and the Memorandum in Support (ECF Nos. 67 and 68) as if re-stated herein.

## I.  Introduction

The timeline of this claim is not in dispute:  Plaintiff was involved in an accident in March of 2018.  Safeco was Plaintiff's automobile insurer at the time.  In September 2022, Plaintiff asked Safeco for consent to settle the underlying matter with the other driver, a waiver of subrogation, and an "evaluat[ion]" of any underinsured motorist ("UIM") claim.  Safeco thoroughly reviewed the records of Plaintiff's treating physicians to timely consent to the settlement, waive subrogation, and make a $4,000 UIM offer in October 2022.  Rather than engage in negotiations or discussions, Plaintiff filed suit in November of 2022.

Two years after her UIM claim was triggered (and over six years after the accident), Plaintiff provided new information regarding her condition and new expert opinions that recommended new additional medical treatment.  The new information prompted Safeco to revise its offer for the UIM claim within days of receipt, and the parties quickly agreed to settle the UIM claim for $25,000.  Since then, Plaintiff has refused to provide payee information for the settlement, despite acknowledging that settlement to the Court.  Plaintiff has also continued to pursue claims for *Hayseeds* damages and statutory and common law bad faith.

Plaintiff's Motion for Summary Judgment is replete with mischaracterizations of fact and citations to the record that do not support the conclusory allegations and the tower of inferences that Plaintiff's interpretation requires.  Plaintiff's Motion desperately hopes that, by throwing enough "stuff" against the wall, perhaps something will stick.

Plaintiff's Motion also continues to demonstrate the impossible standard of omniscience and clairvoyance that Plaintiff seeks to place on Safeco and its adjusters.  This is the most central shortcoming in Plaintiff's Motion.  Plaintiff criticizes Safeco's $4,000 offer compared to the eventual $25,000 settlement two years later, as if Safeco should be expected to predict how

Plaintiff's claimed damages would change.  (ECF No. 69, PageID 702-703.)  And to try to drive that point home, Plaintiff additionally cites to the 2022 $4,000 offer – made on facts known in 2022 – as being just 0.6% of the life plan report provided in of 2024.  (ECF No. 69, PageID 703 & 706.)  Insurers have no duty to be omniscient or clairvoyant, and Plaintiff cannot properly ask the Court to judge Safeco's conduct in 2022 based on events that occurred two years later.

Instead, insurers are required to evaluate the actual claim presented, based on the actual information and evidence available to it, and to offer settlements that reflect the reality of their insured's condition.  Safeco did all of these things.

Accordingly, Plaintiff is not entitled to the summary judgment she seeks.

## II.    Statement of Pertinent Facts

Plaintiff makes numerous mischaracterizations of facts that are not supported by the evidence.  Defendants dedicate this portion of their Response to providing the Court with the actual evidence.  For ease of reference, these are presented in the order of misrepresentation in Plaintiff's Motion.

### A.  *Plaintiff's claim was appropriately handled by qualified individuals*

Plaintiff alleges that her claim should have been referred to the complex claim segment and that Marisa Culbertson did not have any training to handle a traumatic brain injury case.  (ECF No. 69, PageID 685, 698, 701, 702, 707.)

It is true that claims manager, Kelsey Fox, testified that she was not aware why this matter was not sent to the "specific TBI group[.]"  (ECF No. 69, PageID 685.)  However, Safeco's corporate representative explained, "Traumatic brain injury in and of itself doesn't automatically go to complex, depending on the claim's specific situation."  (ECF No. 69-8, PageID 1222, 111:10-12.)  He went on to explain, "The TBI would be transferred to complex if it was -- there was clearly

more significant complaints, ongoing treatments, loss of some, you know, type of cognitive function. Those kinds of things could trigger it to go to TBI or go to complex." (ECF No. 69-8, PageID 1223, 112:1-6.)

As the Plaintiff's medical records reveal, and as Plaintiff's 2021 deposition testimony and the Dr. Nussbaum Report confirmed, Plaintiff was largely healed from any alleged injuries from the accident and was no longer treating with any medical provider for anything related to a traumatic brain injury by September of 2022. There was no evidence presented to Safeco in the seven weeks between when the UIM claim was triggered and Plaintiff filed suit that Plaintiff had experienced anything beyond the concussion for which she completed treatment in 2019.[2]

Furthermore, both Ms. Culbertson and Safeco's corporate representative attempted to identify the training that Ms. Culbertson had that qualified her to evaluate Plaintiff's claim; however, Plaintiff did not want to accept the same if that training was not exclusive to traumatic brain injury. Plaintiff's counsel instead consistently misrepresented the training Ms. Culbertson did have throughout the depositions.

> Q And what kind of training have you had to evaluate the significance of a traumatic brain injury claim?
>
> A We usually do -- there's online courses that we can do, shadowing other adjusters, asking for other adjusters' opinions, things like that on -- on brain injuries.

(ECF No. 69-4, Page ID 1025, 124:7-13.)

> Q Okay. But the adjusters who handled this particular claim, specifically Ms. Culbertson, did not have training with respect to traumatic brain injuries, true?
>
> A No. I wouldn't say that's true. We handle --we handle traumatic brain injury, minor traumatic brain injuries. Traumatic brain injury

---

[2] Indeed, if Plaintiff had suffered a greater injury and knew it in September 2022, one wonders why State Farm offered Plaintiff less than its insured's $50,000 liability limit, and why Plaintiff accepted the same.

in and of itself doesn't automatically go to complex, depending on the claim's specific situation.

Q Well, she testified that she didn't have any training about it, so.

A Well.

Q That's -- yeah. And her testimony will speak for itself. I mean, I can show it to you if you want after the break, but have you had training with respect to traumatic brain injuries?

A I would say minor, like, traumatic brain injuries, non -- like -- I don't know how to really word it, I guess, but, like, there's -- TBIs are diagnosed on a lot of claims.  So emergency room may diagnose a concussion without loss of consciousness or something like that.

. . .

Q Right. And how about what the characteristics of post-concussive syndrome are?

A Yeah. Like, I -- we -- we talk about those things. We've been, you know, trained on those things.

(ECF No. 69-8, PageID 1222, 111:4-112:21.)

Nothing available to Safeco during the seven weeks between when the UIM claim was triggered and suit was filed indicated that Plaintiff's claim was one that was appropriate for the complex claim team.  Instead, all records suggested that the claim was appropriately handled by the team which had received training on minor TBIs, such as emergency room diagnoses of concussions.  Once again, Plaintiff's current position demands that Safeco try to utilize a crystal ball to see that, *six years after the accident*, Plaintiff would allege continued damages related to her concussion that may have justified a transfer to the complex claims team.

### B.    *Safeco appropriately evaluated Plaintiff's UIM claim when it was triggered.*

Plaintiff also represents that Safeco did not evaluate Plaintiff's claim for whether the injuries were permanent, how the injuries affected her life, and whether Plaintiff required future

care.  (ECF No. 69, PageID 692-93, 697-98, 702, 704.)  This is patently false.  While Plaintiff relies on the fact that nothing specifically states "Plaintiff is not permanently disabled" or otherwise articulates all the possible avenues that Plaintiff could have alleged, the records reveal that Safeco performed a proper evaluation based on the medical records available.

The Bodily Injury Evaluation Report indicates that Ms. Culbertson specifically noted various medical records that spoke to Plaintiff's status, how the injuries allegedly impacted her life, and whether additional treatment was required:

- Patient followed up for Post-concussive symptoms. She is 3 weeks post MVA and feels better overall. Headaches rated 6/10 on pain scale. Cognitive symptoms include ongoing memory and concentration problems, although they have significantly improved. She has been able to walk 4-5 days/week. Patient is following the Behavioral Regulation Strategies discussed at last evaluation. She is working FT. She is doing ongoing Vestibular therapy at Wheeling Hospital. NOV in 3 weeks.

- Patient followed up for post-concussive symptoms. DX: Concussion, w/out LOC. She is now 9 months post MVA. She is 80% back to normal. She still gets headaches about 2 times/week. She notices dizziness and fatigue after long days. Vestibular exercises have gotten much better. Cognitive symptoms have resolved. Patient will continue with Vestibular therapy and work FT. NOV is in 4-6 weeks.

- Patient seen for follow up/re-evaluation and management of a head injury sustained on 3/21/2018, after an MVA. Symptoms are improving. Mood has improved. She is engaged in Vestibular therapy and is completing HEP daily. She completed PT for her neck. She is working FT. Patient will continue with Vestibular therapy and work FT. NOV is in 2-3 weeks.

> \- 40 year old female seen for mid-low back spasms, for the past week. She was
> walking her dog and he started chasing another dog, making her twist her back.
> She's been taking OTC w/ some relief. DX: Acute bilateral thoracic back pain.
> NOV in 1 week.

> **General Damages** (consider evaluated recovery period, impact on lifestyle, permanency, disability):
>
> Plaintiff TX from DOL, 3/21/2018, through 12/20/2021. Injuries are primarily ST. TX was
> conservative. Diagnostics were negative.
>
> TX consisted of EMS, ER, PCP care, PT care and 2 injections. Plaintiff began TX for a TMJ
> injury, in 11/2020, which was 2.5 years post loss. We are not accepting this as related.

(ECF No. 68-6, PageID 548-52.)

Ms. Culbertson testified that these types of records, along with others provided, indicated that Plaintiff was able to continue performing her duties at home and at work and that Plaintiff was indicating to her medical providers that her condition was getting better. (ECF No. 69-4, PageID 1039-44, 138:13 – 143:4.) These also firmly established that Plaintiff was not seeking any ongoing treatment for any of her injuries; thus, there was no basis to document any required future medical treatment.

Further, nothing in Plaintiff's records indicated any on-going mental health disorder as later alleged by Dr. Saar. Indeed, Plaintiff reported to her doctor that "driving between [work] appointments" was her "breaks." (ECF No. 69-4, PageID 1043-44, 148:4 – 143:4.) Certainly, such a representation made to her medical provider does not justify consideration of a traumatic disorder of any kind.

### C.  *Plaintiff never made a demand pre-suit for policy limits.*

Plaintiff relies on a claim file note by Defendant Marisa Culbertson to argue that Plaintiff did make a policy limit demand.  (ECF No. 69, PageID 686.)  However, Plaintiff never asked Ms. Culbertson about that claim note in her deposition.  In fact, Ms. Culbertson testified,

> Q And is it your understanding that the claimant was seeking their policy limits?
>
> A I don't remember specifically if she was or not.
>
> Q Do you think that she made a demand for less than the policy limits?
>
> A I -- I'm not sure. I'd have to review the demand letter.

(ECF No. 69-4, PageID 991-92, 90:25-91:7.)

Had Plaintiff's counsel questioned Ms. Culbertson about the demand letter, or shown it to her, Ms. Culbertson would have noted that the letter only requested that "Safeco evaluate the claim on behalf of its policyholder under the applicable UIM policy."  (ECF No. 68-2, PageID 540.)  As set forth in the attached Affidavit, the "policy limit demand" Ms. Culbertson referred to in her claim note was Plaintiff's August 11, 2022 letter **to State Farm, the tortfeasor's insurer** that was attached to the September 26, 2022 letter to Safeco – not to the September 26 letter itself.  (Aff. of M. Culbertson, attached as "Exhibit A.")  There is no question that Plaintiff's counsel made a policy limit demand **to State Farm** for the tortfeasor's liability coverage limit, and there is no question that Ms. Culbertson considered the same in evaluating the UIM claim.  But, no evidence or testimony in this case indicates that Plaintiff made any pre-suit demand **to Safeco** – for "policy limits" or otherwise.  Instead, the evidence – including from Plaintiff's counsel's letter itself – reveals that is not the case.

Furthermore, Ms. Culbertson's notation regarding Plaintiff's comment as to what Safeco "should" be doing was not posed as a demand for resolution.  Instead, Plaintiff's counsel questioned the policy limits available, expressed frustration at the evaluation of Plaintiff's claim and expressed his intention to file suit.  (Ex. A.)  Again, nothing in counsel's letter constituted a "demand" for anything.

### D.  Safeco did not misrepresent the amount of medical specials considered by Safeco in formulating its offer.

Plaintiff next asserts that "Safeco's 30(b)(6) witness begrudgingly acknowledged that the November 4, 2022 letter misrepresented the amount of medical specials considered by Safeco[.]" (ECF No. 69, PageID 686.)  Once again, Plaintiff is significantly mischaracterizing the evidence. It is true that Safeco's November 4, 2022 offer letter did not specifically state that the number of medical specials were reduced to $31,226.64.  However, Safeco did communicate to Plaintiff's counsel that they were not accepting treatment for the TMJ treatment: "Her diagnostics were negative, and she didn't begin treating for the TMJ injury until November, 2020, which was about 2.5 years post loss."  (ECF No. 69-6, PageID 1109-10.)

Indeed, the fact that Safeco's analysis was **based** on the full amount of medical specials that Plaintiff submitted is accurate, since that was the amount with which Safeco started its evaluation.  (ECF No. 68-6, PageID 548-52.)  Safeco also advised of the other considerations on which it generally based its evaluation.  (ECF No. 69-6, PageID 1109-10.)  At no point, however, did Safeco represent – internally or to Plaintiff – that it had accepted all of Plaintiff's claimed medical specials.

Safeco's corporate representative acknowledged that the specific number was not in the claim note or in the letter; however, he also explained:

> Q Okay. But that's actually not a true statement for how the claim was evaluated by Safeco, correct?
>
> A Well, *it goes on to say that she didn't – she didn't take into account the TMJ injury, so -- which was what -- the part that she deducted out of, right?  Correct*?
>
> Q Well, I don't know that at all, but it indicates that the specials are around 37- to 38,000.
>
> A That -- that is correct. Yes.

(ECF No. 69-8, PageID 1241, 130:4-130:25.  Emphasis added.)  Once again, Plaintiff has refused to acknowledge testimony that does not feed into her narrative of the claim, regardless of the truth of the evidence.

### E.  Marisa Culbertson considered all appropriate evidence in adjusting Plaintiff's claim

Plaintiff has placed great importance on various terms Plaintiff's counsel uses in his depositions to artificially allege wrongdoing on the part of Safeco.

Plaintiff alleges that Safeco did not "determine what a typical jury would award this specific insured for recoverable damages permitted by law under the circumstances."  (ECF No. 69, PageID 687.)  It was clear that Plaintiff was referring to research regarding jury verdicts in the matter.  Ms. Culbertson testified, though, that claim value could be based on the adjuster's expertise, conducting a roundtable, conferring with other adjusters and management, conferring with defense counsel, or looking up recent awards in the jurisdiction.  (ECF No. 69-4, PageID 963-64, 62:8-63:12.)

However, to the extent there was any confusion regarding that testimony and whether Plaintiff was referring to the narrow question of jury verdict research or more broadly, Ms. Culbertson further testified:

> Q What are the things that a jury considers when it's determining what to award a party in a lawsuit?

A They would probably look at medical records, bills, obviously, if there's any extra things like lost wages, or if there is permanency, or disability, or anything like that.

Q So I'm going to still stick in with the shared screen. I'm going to go scroll up a bit to what's been Bates marked Safeco 111 and it's titled "Bodily Injury Evaluation BIE Worksheet." Can you see that?

A Yes.

Q Okay. Are the considerations articulated in your worksheet those that you understand that a jury would consider when evaluating Ms. Kreitzer's claim in a court of law?

A Yes. You mean under, like, the general damages that you would take into consideration, recovery period, impact on lifestyle, or records, all that?

Q Sure.

A Yeah.

Q All of it. All of it. So for example, I'll direct your -- you know, your attention to where you
have a liability analysis. Would a jury considered a --14 consider a liability analysis in this matter if it were before court?

A Absolutely. Yes.

Q Okay. Would a jury consider the alleged medical treatment and -- I think you mentioned they would consider medical records, fair?

A Fair. Yes.

Q Looking down here, you have on Safeco 114, there's notations about prior medical history, is that something else that a jury would consider?

A Yes.

Q And as we're going through this, there's things such as her medical specials that are articulated. There's a wage loss specials, general damages. There's special factors, negotiations, et cetera.

> Is it your understanding that by performing the BIE work worksheet analysis that you were considering the same factors that a jury would consider in evaluating Ms. Kreitzer's claim?
>
> A Yes.

(ECF No. 69-4, PageID 1036-38, 135:16-137:9.)

### F.  Safeco continued to properly investigate the claim throughout litigation.

Plaintiff improperly alleges that Safeco did "no additional investigation" on Plaintiff's claim after suit was filed.  This is, at this point unsurprisingly, patently false.

This matter was removed from State Court to this Court.  (ECF No. 1.)  The Parties are prohibited from engaging in discovery under after a Rule 26(f) meeting has taken place.  (ECF No. 69, PageID 687.)  Plaintiff filed a Motion to Remand that was based on her argument that the amount in controversy necessary for this Court to exercise diversity jurisdiction was not exceeded – an ironic position, given that Plaintiff now argues that the full scope of her damages were known to Safeco before suit was filed.  (ECF No. 6-1.)  The Motion was fully briefed and then decided on January 23, 2023.  (ECF No. 9.)

The Parties then engaged in written discovery, including a discovery motion which the Parties resolved with good faith conferences and the handling of an Agreed Proposed Protective Order.  (ECF Nos. 14, 17, 23, 27, 29, 30, 31, 33, 34.)  Further, Safeco served written discovery requests on Plaintiff on March 7, 2023.  (ECF Nos. 14 & 15.)  Plaintiff responded to the written discovery on April 21, 2023.  (ECF No. 22.)  Safeco served supplemental discovery responses on December 15, 2023, and January 5, 2024 .  (ECF Nos. 36, 37.)[3]

---

[3] Further, the Parties twice jointly moved to Amend the Scheduling Order before the production of Dr. Saar's report. (ECF Nos. 38, 40.)  Each time was due to circumstances beyond the control of either Party and was due to the extension of professional courtesy and reasonableness.  (*Id.*)  The time impacted was the fourth quarter of 2023 and the summer of 2024.  (*Id.*)  To argue that the failure to conduct additional discovery during that time is unreasonable.  Safeco certainly does not wish to go in-depth to the circumstances giving rise to those continuances; however, if the issue of whether Safeco conducted discovery related to Plaintiff's claim during that time becomes an issue, Safeco will be forced to do so.

The written discovery provided copious amounts of information to review and analyze, including the Rule 35 report of Dr. Nussbaum and the 2021 deposition of Plaintiff, both of which supported Safeco's pre-suit analysis as discussed in Safeco's Motion for Summary Judgment and the associated Memorandum in Support.  Accordingly, Safeco did not require an additional medical examination or to speak to Plaintiff's medical providers.

### G.  *Safeco responded promptly to the evidence provided to it.*

Plaintiff's next allegation – that Safeco "made no effort to re-evaluate the plaintiff's claim" – is also incorrect.  Dr. Saar's report was provided to counsel for Safeco on September 25, 2024.  (ECF No. 68-13.)  On the same day, counsel for Safeco responded: "I note that Appendix A indicates it is page 1 of 2. Could you please confirm whether we are missing a page or of it is just a topographical[sic] error, I would appreciate it."  (Email from E. McQuain to R. Miller and G. Sidiropolis (Sept. 25, 2024), attached as "Exhibit B.")  Counsel for Safeco followed up again on this issue on October 10, 2024.  (Email from E. McQuain to R. Miller and G. Sidiropolis (Oct. 14, 2024), attached as "Exhibit C.)  And again on November 7, 2024.  (Email from E. McQuain to R. Miller and G. Sidiropolis (Nov. 7, 2024), attached as "Exhibit D.")  Plaintiff's counsel provided no response.

On November 11, 2024, Dr. Bowman's report was provided and the $25,000 was promptly offered on November 13, 2024.  (ECF No. 68-14.)

To say that Safeco did not reasonably continue to investigate Plaintiff's claim is demonstrably false and contrary to the actual actions that took place.  To further attempt to characterize Safeco as "failing to acknowledge and act reasonably promptly upon communications" is blatantly wrong.

**H. *Safeco's corporate representative did not testify that Plaintiff's policy should be reformed.***

Plaintiff next attempts to argue that Safeco has admitted that Plaintiff's policy limits should be reformed based on the testimony of Safeco's corporate representative.  (ECF No. 69, PageID 690.)

However, the testimony actual states:

> Q Okay. And based upon your experience, what would be the impact of there not being a selection made on the selection rejection form in the state of West Virginia?
>
> A That ***could*** trigger coverage at a minimum -- state minimum limits or some -- some variation of that.
>
> Q Okay. And so the selection rejection form, now this is the interesting part, no selection is made.  It's simply signed. Were you aware of that?
>
> A I was not.
>
> Q Okay. And what would the impact of that be, sir?
>
> A I mean, this -- ***it would require further review on sort of state specifics for West Virginia, and we would usually review, you know, that in terms of like a coverage review.***

(ECF No. 69-8, PageID 1147, 36:3-12 (emphasis added).)

> Q And I think you indicated earlier that you believe that under these circumstances the policy would need reform such that Ms. Kreitzer would receive the UIM limits up to her liability limits, ***if your recollection of West Virginia law is correct***; is that accurate?
>
> A ***That's accurate***.

(ECF No. 69-8, PageID 1265-66, 154:24-155:4 (emphasis added).)

Despite Safeco's corporate representative's continued indication that he would need to review West Virginia law to assess what would happen in light of the form and his continued qualification of his responses that he was not certain of its impact, Plaintiff now attempts to

characterize those statements as admissions that the Policy should be reformed.  This is, once

again, simply not the case.

### I. Safeco never "confirmed" that Safeco's bonus structure incentivizes reducing claim payments.

Unsurprisingly, Plaintiff also mischaracterizes the actual testimony regarding Safeco's

bonus structure to serve her narrative.  While Plaintiff purportedly cites to a portion of Safeco's

deposition testimony to support its alleged admission, a review of that testimony reveals a very

different characterization by Safeco's corporate representative:

> Q Well, how can a claims employee influence the combined ratio for
> an insurance company?
>
> A Individually, it's mostly -- I mean, *your individual contribution
> is timely handling claims, paying what we owe*. It's -- those are the
> two main things that we do, you know, properly investigate -- quality
> goes into, you know, investigating coverage liability. That way we
> know we're paying the claims that we should be paying.

(Depo. of A. Pickel 86:1-7 (relevant portions attached as "Exhibit D."  Emphasis added.)

> Q Are you concerned that tying adjuster bonuses to how much
> money is paid out on claims subtly encourages adjusters to look for
> a reason to pay less on claims?
>
> A No.
>
> Q Why?
>
> A I've -- *I've worked at this company for 23 years, and I've never
> been told anything but to pay what we owe.* That doesn't -- the
> bonus is never factored into. There's nothing written into the bonus,
> you pay less for claims and -- to make more money.
>
> And claims department specifically is the portion of the insurance
> company, as you point out, that pays money. That's what we do. And,
> like, the profit isn't made here on any -- any one individual claim,
> any one individual claims adjuster's desk, or any one department.
>
> Q And *has anyone at Safeco or Liberty Mutual told you that
> they're concerned that tying adjuster bonuses to corporate*

*profitability may send the wrong message to adjusters to pay less on claims?*

A *No.*

Q Does the incentive program create a conflict of interest by forcing claims personnel to choose to serve their own financial interests or to serve the policyholder's interests?

A I don't believe so, no.

. . .

Q Yeah. So does Safeco or Liberty Mutual train its employees to be mindful of the potential for a conflict of interest created by the Variable Incentive Program?

A I -- I mean, I would say that *they train us to pay what we owe*, *and that's the most important part of what we do*. I don't know that they specifically tie it to the incentive program.

Q So is there any training regarding potential conflicts of interest created by the Variable Incentive Program and the duties to policyholders?

A Not that I'm aware of, not off the top of my head.

Q And can we agree that there is an opportunity for claims personnel to put their own financial interests ahead of the financial interests of the policyholder?

A Is there an opportunity? I mean, no, not -- There is -- there's -- like I said, there's no one claim that can impact that number, to my knowledge.

. . .

I -- I look at the training on paying what we owe and evaluating each claim as the merit of what you're saying. I -- it's just kind of the obvious way to do it.

I mean, we -- we are trained to pay the claim based on what that claim is owed within the policy limits. It's never -- it's never in my career been brought to anyone telling somebody to pay less on a claim to save money.

Q Yet Safeco and Liberty Mutual provide financial incentives to do just that, true?

A I don't agree with that. No.

(Ex. E, 92:16-96-:21.  Emphasis added.)

Safeco's testimony is in stark contrast to Plaintiff's erroneous assertions that "Safeco's 30(b)(6) witness also confirmed that Safeco's bonus structure incentivizes reducing claim payment and reducing the cost of investigating claims by tying bonuses for the claim department to corporate profitability" and Plaintiff's misrepresentation that "Safeco does not train its employees to be mindful of the potential conflict of interest that is created by a bonus structure that rewards reducing claim payment and paying less money to investigate claims."  (ECF No. 69, PageID 691.)

Yet again, Plaintiff has disregarded significant portions of testimony and mischaracterized the statements therein to support her fictitious narrative.  While a party can survive summary judgment by identifying genuine issues of fact; and while a party is entitled to summary judgment when there are no genuine issues of fact and the facts cut in that party's favor; nothing about Rule 56 allows Plaintiff to just make things up and then ask for judgment in her favor.

## III.    Plaintiff is not entitled to judgment as a matter of law.

### A.  Standard for Summary Judgment

Plaintiff relies on demonstrably false allegations and mischaracterizations of the facts to support their Motion.  Once the actual evidence is examined, Plaintiff's arguments fall flat and cannot be supported.

It is well established that "[a]lthough the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

*See also*, *Carper v. Clay County Bd. of Health*, 2016 WL 2869892 (4th Cir. 2016), affirming *Carper v. Clay County Bd. of Health*, 2015 WL 4163277 (S.D. W.Va. 2015).

Therefore, the undisputed facts, when actually examined, do not support Plaintiff's Motion for Summary Judgment, and in fact, supports Defendants' Motion for Summary Judgment.

**B. The actual undisputed facts establish that judgment should be entered on Plaintiff's UIM claim in the amount of $25,000, with a judgment in Safeco's favor regarding any additional damages.**

As demonstrated by Defendant's Motion for Summary Judgment, and as confirmed in joint filings to the Court, the issue of the policy proceeds has been resolved between the Parties and Plaintiff is entitled to judgment for the settled amount of $25,000.

**C. Plaintiff's "Hail Mary" attempt to reform the Policy AFTER the claim had been settled is improper and cannot serve as a basis to reform the Policy.**

Plaintiff represented to the Court that the claim for policy proceeds was resolved.  (ECF No. 48 at ¶¶ 7 & 11 ("The Parties have resolved Plaintiff's claim for policy proceeds, leaving Plaintiff's claims for extracontractual damages and bad faith;" "Given the Parties' success at resolving Plaintiff's underlying policy claim, the Parties remain interested in exploring the potential resolution of the matter in full in advance of expending additional resources on discovery.")

The Court then relied on the parties' assertion that they had "success at resolving Plaintiff's underlying policy claim" when deciding to grant the Joint Motion and amending the Scheduling Order.  (ECF No. 49.)

Safeco additionally relied on this representation in proceeding with discovery, a reasonable reliance when that representation is filed with the Court.

It was not until the deposition of Safeco's corporate representative on April 14, 2025, a deposition taken beyond the discovery deadline as agreed upon by the Parties and approximately

five months after the contract claim was resolved, that Plaintiff raised the issue of reforming the Policy.

It is undisputed that Plaintiff had the relevant UIM form in its possession given that it produced the document in discovery.  (Kreitzer 000877-000878, attached as "Exhibit F.")  Furthermore, Plaintiff had raised the question regarding UIM limits pre-suit.  (ECF No. 69-5, PageID 1108.)  However, Plaintiff agreed to resolve the matter for what Safeco held as the policy limits of $25,000.  Since Parties are entitled to, and frequently do, resolve claims that are in dispute for less than what they believe is full value, Plaintiff cannot now argue that Safeco "misrepresented" the policy limits.

As articulated above, no aspect of Safeco's testimony requires Safeco or provides a basis for this Court to nullify the settlement and reform the Policy.  Indeed, Safeco's corporate representative specifically, and repeatedly, indicated that he would need to check West Virginia law to be certain of what would have happened.

Under West Virginia law, while a completed UIM selection form creates a presumption that an effective offer of UIM coverage was made and that the insured made an informed election, WV Code 33-6-31f, such a form is not the only way to demonstrate a commercially reasonable offer of UIM coverage was made and knowingly elected by Plaintiff.  *Thomas v. McDermitt*, 232 W. Va. 159, 751 S.E.2d 264 (2013).

In *Thomas*, when State Farm could not produce an executed rejection form, the Court indicated that "State Farm's assertion that its offer was commercially reasonable and knowingly rejected will be evaluated under the standards enunciated in *Bias **after thorough discovery opportunities by the parties***."  *Id.* at 173, 751 S.E.2d at 278.  (Emphasis added.)  Accordingly, when a UIM claim has not already been settled, an insurer should be provided the opportunity to

demonstrate "that an effective offer was made, and that any rejection of said offer by the insured was knowing and informed." *Id.* at 163–64, 751 S.E.2d at 268–69 (citation omitted).

In this action, Safeco never needed to demonstrate, or even conduct discovery on, the reasonableness of its UIM offer, because – despite being aware of the issue – Plaintiff and her counsel agreed to settle the UIM claim for $25,000. Had the UIM claim not settled, the parties presumably would have conducted discovery on this issue and perhaps presented the issue to the Court for resolution. But, Plaintiff and her counsel cannot seek to void that settlement, after the close of discovery, simply by saying that maybe they should have made different arguments or sought a different amount.

### D.  Plaintiff is not entitled to damages for *Hayseeds*.

Rather than restate herein the full argument against Plaintiff's Motion as to *Hayseeds*, Safeco incorporates by reference it's Motion for Summary Judgment and the Memorandum in Support as if restated in full. Plaintiff's claim for *Hayseeds* damages fails because Plaintiff made no pre-suit demand and because Plaintiff's UIM claim at the time of settlement was markedly different that at the time of pre-suit presentation to Safeco.

Furthermore, the above articulates why each of Plaintiff's factual allegations that allegedly supports her claim is false. Accordingly, Plaintiff's claim cannot be supported and Safeco is entitled to judgment as a matter of law.[4]

---

[4] To the extent the Court holds that Plaintiff is entitled to any *Hayseeds* damages, any recovery by Plaintiff under *Hayseeds* must be limited to those necessary to recover policy proceeds and must be cut off on the date claim for policy limits was resolved. *Moses Enterprises, LLC v. Lexington Ins. Co.*, 66 F.4th 523, 529 (4th Cir. 2023) (when an insured pursues her contract claim at the same time as she pursues a UTPA claim only the fees and costs "necessary to obtain payment of the insurance proceeds" are recoverable for substantially prevailing on the insurance claim even if the two claims are pursued simultaneously; *Lemasters v. Nationwide Mut. Ins. Co.*, 232 W.Va. 215, 751 S.E.2d 735 (2013) (The Supreme Court confirmed that while an insured is entitled under Hayseeds to recover fees and costs "vindicating its claim" "to collect benefits under [its] insurance contract," the insured is not entitled to recover fees and costs for "a bad faith action.").

**E.  Plaintiff is not entitled to judgment as a matter of law on Plaintiff's statutory bad faith claim.**

Each and every action alleged by Plaintiff to support purported violations under the Unfair Trade Practices Act ("UTPA") has been demonstrated to be false.

Safeco incorporates by reference it's Motion for Summary Judgment and the Memorandum in Support as if restated in full to conserve the Court's time and resources in reading duplicative arguments.

The undisputed facts demonstrate that this case is remarkably similar to *Raszkiewicz v. Progressive Max Ins. Co.*, in which this Court entered judgment, and the Fourth Circuit affirmed the judgment, for the UIM insurer.  2025 WL 1177259 (4th Cir. Apr. 23, 2025); *Raszkiewicz v. Progressive Max Ins. Co.*, 2023 WL 4998589 (N.D. W.Va. Civil Action No. 5:21-cv-38, July 25, 2023.)  Accordingly, Defendants are entitled to the same relief.

**F.  Plaintiff is not entitled to judgment as a matter of law on punitive damages.**

When Plaintiff's allegations are viewed within the clarity provided by the full scope of the actual testimony and facts, Plaintiff's claim for punitive damages fails.  There are no facts that meet the high threshold of actual malice as is required by West Virginia law.  *Bordas v. Alps Corp.*, 2014 WL 1962264, *3 (N.D. W.Va. Civil Action No. 5:12cv126, May 15, 2014), citing *McCormick v. Allstate Ins. Co.*, 505 S.E.2d 454, 459 (W.Va.1998).  There is certainly no evidence that Plaintiff has presented this claim by "clear and convincing" evidence.

**IV.    Conclusion**

For the above reasons, Plaintiff is not entitled to summary judgment, though Defendants are.

Respectfully submitted,


 /s/ Elise N. McQuain
William M. Harter (W.Va. Bar No. 7977)
Elise N. McQuain (W. Va. Bar No. 12253)
FROST BROWN TODD LLP
10 West Broad Street, Suite 2300
Columbus, OH 43215
(614) 464-1211 / (614) 464-1737 (fax)
wharter@fbtlaw.com
emcquain@fbtlaw.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA
## AT WHEELING

| | |
|---|---|
| **MAURA ANNE KREITZER,** | : |
| | : |
| **Plaintiff,** | : |
| | : **CIVIL ACTION NO. 5:22-cv-312** |
| **vs.** | : |
| | : **Judge Bailey** |
| **SAFECO INSURANCE COMPANY OF** | : |
| **AMERICA, a Liberty Mutual Company,** | : |
| **LIBERTY MUTUAL INSURANCE** | : |
| **COMPANY and MARISA CULBERTSON** | : |
| | : |
| **Defendants.** | : |

## CERTIFICATE OF SERVICE

On this 12th day of May, 2025, a true and accurate copy of the foregoing was filed with the

Court and served via ECF on all counsel of record.


*/s/ Elise N. McQuain*
Elise N. McQuain (W. Va. Bar No. 12253)


0000T69.0764577  4899-8135-6351v2