# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

November 26, 2024

George N. Sidiropolis, Esquire
Flanigan Legal, PLLC
1140 Main Street, 4th Floor
Wheeling, WV 26003

**RE:  *Maura Anne Kreitzer v. Safeco Insurance Company of America, Liberty Mutual Insurance Company, and Marisa Culbertson*, Civil Action No. 5:22-CV-312, In the United States District Court for The Northern District of West Virginia Wheeling**

Dear Mr. Sidiropolis:

You have provided me with the following claim-related documents and have requested my review and analysis of the claim handling demonstrated by Safeco Insurance Company of America, Liberty Mutual Insurance Company (Safeco), and Marisa Culbertson, relative to the Underinsured Motorist (UIM) claim submitted by its insured, Maura Anne Kreitzer.

In this regard, you have asked me to outline the industry standards of acceptable conduct in the handling of UIM claims.

In this regard, you have provided me with the following pertinent documents for my review and analysis:

    (a)  Ohio Department of Public Safety Traffic Crash Report

    (b)  James Beck's Criminal Case File

    (c)  Depositions of James Beck and Maura Kreitzer

    (d)  Driving Record of James Beck

    (e)  Medical Records and Billing Records

    (f)  Photographs

EXHIBIT B

## SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

(g)  Property Damage Estimate

(h)  Rule 35 Report of Paul D. Nussbaum, PhD

(i)  Report of Timothy Saar, PhD

(j)  Report of Richard Bowman, MD

(k)  Correspondence, pleadings and discovery related to Belmont County Court of Common Pleas Case No. 20-cv-92, styled Kreitzer v. Beck

(l)  Correspondence, pleadings and discovery related to U.S. District Court for the Northern District of West Virginia, Case No. 5:22-cv-312

(m) Plaintiff's production of discovery documents Kreitzer 000001-001227

(n)  Defendant's production of discovery documents Safeco 000001-002226

After reviewing and considering these documents I have outlined my forensic findings in this report to follow.

My analysis and professional opinions are found in the body of this report based upon my subject matter expertise, specialized knowledge, training, and vast experience in the handling of automobile claims since beginning my career 36 years ago. All professional opinions expressed herein are made within a reasonable degree of professional certainty.

## I.    QUALIFICATIONS

My West Virginia adjuster's license is current and bears license number 20719767.

Additionally, I hold adjuster licenses in Texas and Florida, and a property damage physical damage license in Pennsylvania. My licenses enjoy reciprocal agreements with most every state that does require licensing.

Over the course of my career in the industry, I have reviewed the claim practices and claim handling materials from personal lines, property and casualty and commercial lines insurers and have become familiar with how various insurers have processed, handled, adjusted and supervised personal lines and commercial claims in both first and third-party contexts. I have learned industry claim handling standards based on personal study, training, industry education, research, and industry experience for over three decades.

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

From 1988 through 2012, I was employed by State Farm Insurance Companies handling and supervising insurance claims. I have considerable experience in the handling and management of third-party, contractual and extra-contractual lawsuits. Over the past twelve years as an independent claim consultant, I have reviewed a number of claims involving Liberty and its affiliates including Safeco Insurance Company and I am familiar with its claim handling practices.

Since resigning as a litigation team manager in 2012, my career has focused on consulting legal counsel relative to insurance coverage and claims and conducting insurance-related mediations.

My testimony has been admitted in both federal and state courts in many jurisdictions across the United States of America including West Viginia.

As an industry expert, I was asked to testify before the Pennsylvania Senate Banking & Insurance Committee relative to my analysis and opinions regarding the impact proposed changes to the Pennsylvania Motor Vehicle Financial Responsibility Law would have on the insurance industry in terms of verdicts, settlements, and premiums.

I am a past President of the Pennsylvania Defense Institute (PDI), one of the largest defense organizations in the country. In the seventeen years that I was an active member of PDI, I also was Chairman of several committees including Coverage and Claims Practices, and Amicus Curiae, a Director on the Board of Directors. In my leadership role, I interacted with the Defense Research Institute, a national organization, and attended various regional meetings and its national convention and Continuing Legal Education (CLE).

Additionally, I was the course planner for several Auto Law Continuing Legal Education (CLE) seminars. Throughout my career, I have attended professional seminars and continuing legal education seminars, both regional and national in scope, relating to, inter alia, insurance industry claim practices and procedures, policy and coverage and bad faith.

I have served as faculty for the Pennsylvania Bar Institute, the Pennsylvania Association for Justice, the Pennsylvania Defense Institute, the West Virginia Association for Justice, the Florida Justice Association, and the Kentucky Justice Association relative to insurance, claims practices, bad faith, policy, and other related topics.

Attached to this report is my Curriculum Vitae. In reaching the opinions and conclusions outlined in this report, I have relied upon my experience, specialized

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

education, training and extensive background in handling insurance claims spanning over the past 36 years.

## II.    PURPOSE OF REVIEW

In working directly with insurance consumers for decades, it has been my first-hand experience that a vast majority of insurance consumers, even those considered highly educated and sophisticated, most often do not fully understand insurance policies, coverages and the benefits offered by those policies. This is also true for the claims process and the applicable industry standards.

Tom Baker, a professor of law and a scholar of insurance law at the University of Pennsylvania Law School, formerly the Connecticut Mutual Professor of Law and Director of the Insurance Law Center at the University of Connecticut, may have expressed it best when he wrote,

> *"For most people most of the time, insurance remains firmly in the background of consciousness, part of the dimly understood and taken-for-granted social infrastructure."*[1]

It is for this purpose that I offer this report and perhaps testimony. My doing so is not an effort to usurp the role of the ultimate factfinder in this case, but rather to help the ultimate factfinder better understand the claim handling evidenced in this case against the backdrop of my considerable experience, training, education and specialized expertise in the insurance claims industry.

In this regard, the professional opinions expressed herein are solely intended to help the ultimate factfinder understand the facts as they apply to normal and customarily acceptable insurance claim practices, the rules and regulations that are universally taught to claim professionals and the purpose for the existence of particular standards and acceptable practices.

Whether or not violations of certain industry standards of conduct in the context of any claim meets or exceeds the bad faith standard or threshold is ultimately in the hands of the factfinder.

---

[1]  Baker, Tom, *Insurance Law and Policy: Cases, Materials, and Problems*, University of Connecticut School of Law, Aspen Publishers, Inc., New York, NY (Copyright 2003)

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

Additionally, this report does not propose to assert any legal opinions or conclusions. Similarly, if asked to testify in this matter, my testimony is not being offered as a legal expert and therefore, I will not explain the law to the factfinder.

However, because the business of insurance claims requires a working knowledge of certain basic legal principles and concepts, claims-related statutes and regulations and the like, any discussion in this report concerning such topics is done so from the perspective of a claim professional.

In this regard, I have earned a professional designation relative to claims law. In addition to obtaining professional certification, claim professionals also routinely undertake various types of training relative to legal and compliance issues.

References to the importance of a claim professional's competency in relation to understanding laws and how statutes and case law affect claims are abundant. To follow are just a few examples found in industry texts that are used in the professional training of claim professionals everywhere:

> *"Fair evaluations result from thorough, timely, and unbiased investigation and from an understanding of the laws of the jurisdiction in which the claim is brought."*[2]

> *"An understanding of how laws affect coverage is necessary to avoid excessive litigation costs and to protect the insurer from claims of bad faith claims handling."*[3]

> *"...claim representatives must interpret coverage with the policy in one hand and statutory or case law in the other."*[4]

Although most claim professionals are not lawyers and therefore prohibited from giving legal advice, all claim professionals endure some basic training on legal principles and concepts as it is clear the role of a claim professional demands a certain competency in understanding the laws that govern routine claim handling.

Furthermore, when claim issues do require a more in-depth understanding of the law, claim handlers are trained to engage legal counsel.

---

[2] Popow, p. 9.28
[3] Popow, p. 8.3
[4] *Ibid.*

## SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

### III.   CLAIM HANDLING

On **September 26, 2022**, correspondence was sent to Safeco claim representative Ebon Moore demanding the UIM limits of $25,000 and Notice of the settlement to the UIM carrier pursuant to W.Va. Code § 33-6-31e.

In pertinent part, the policy limits demand letter reads as follows:

> *Attorney Matthew Mullen, Krugliak Wilkins Griffiths & Dougherty Co., LPA, has extended a settlement offer on behalf of State Farm in the amount of $45,000. I am requesting consent to settle, waiver of subrogation and that Safeco evaluate the claim on behalf of its policyholder under the applicable UIM policy.*

> *We believe that the settlement offer of $45,000 constructively exhausts the $50,000 policy limits of State Farm Mutual Automobile Insurance Company's policy number 894-2954-F18-35. We also maintain that the value of Mrs. Kreitzer's claim far exceeds the $50,000 policy limits and advised attorney Mullen and State Farm of its client's personal exposure should this matter proceed to trial.*

> *On August 11, 2022, I wrote to attorney Mullen, "In the spirit of good faith" and requested that State Farm "immediately tender its available policy limits in exchange for a release of all claims." ...  I explained that further delay was unacceptable...Ohio law requires that insurers accept settlement offers within policy limits when the insured faces the threat of exposure beyond policy limits.*

> *It is our understanding that State Farm's frontline adjuster and attorney Mullen both valued Mrs. Kreitzer's claim in excess of the policy limits, but that State Farm management authorized $45,000. State Farm's conduct is highly disappointing.*

> *It is our desire to dismiss the complaint against the tortfeasor and proceed with a UIM claim/case in West Virginia which is the home state of your insured. I have enclosed a copy of Mrs. Kreitzer's pertinent medical records for your review and consideration. **Exhibit B**. Mrs. Kreitzer's medical specials total approximately $37,785.29. **Exhibit C**. I have also enclosed copies of her medical bills for your file. **Exhibit D**. I am also enclosing the report of Alicia Trbovich, PhD, UPMC Sports Medicine*

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

Concussion Program. **Exhibit E**. Please allow Dr. Trbovich's report to supplement plaintiff's expert witness disclosures. **Exhibit F**.

Dr. Trbovich's report was prepared without the benefit of Dr. Nussbaum's report or the raw data from the testing performed by Dr. Nussbaum. I have enclosed a copy of Dr. Paul D. Nussbaum, Ph.D., ABPP which was made pursuant to Rule 35 of the Rules of Civil Procedure and paid for by State Farm.

Dr. Trbovich concludes that it is unclear that Mrs. Kreitzer made a complete recovery from the concussion she sustained on March 21, 2018. However, Dr. Nussbaum concludes that Mrs. Kreitzer "demonstrates relative deficits on measures of Working Memory and Processing Speed. The latter reduces her overall general intelligence to the average range, slightly less than expected given her estimated premorbid intelligence. Her performance on other measures of cognitive performance similarly is variable with normal verbal free recall, verbal abstraction and visuospatial/constructional skill. In contrast, she demonstrates impairment on tasks measuring rapid visual sequencing and mental flexibility."

Dr. Nussbaum's report also indicates that Mrs. Kreitzer has a premorbid high IQ, that her working memory and processing speed fall in the low average and borderline range and are responsible for a reduced IQ presumably as a result of closed head injury and mild-traumatic brain injury. For example, the report states that Dr. Nussbaum's testing demonstrates low average ability on a measure of auditory attention and visuomotor speed and that Mrs. Kreitzer's performance on a measure of rapid visual matching falls in the borderline range. The report further indicates that Dr. Nussbaum "completed four measures that comprise the domain of complex attention/processing speed. Each of these measures has a mean of 10 and a standard deviation of 3."

According to Dr. Nussbaum, Mrs. Kreitzer's "[s]cores fall within the borderline to average range with generally reduced ability relative to her estimated premorbid intelligence." The examination also concludes that in reference to Mrs. Kreitzer's verbal abstraction ability, her "performance on a measure of rapid visual-motor sequencing (Trails A) falls in the impaired range (T 20) due to slowed speed. On a similar, but more

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

*complex task in which she was asked to alternate rapidly between numbers and letters fell in the impaired range primarily to slowed speed."*

*All of this information further militates in favor of the conclusion that Mrs. Kreitzer suffers an increased risk of dementia. For example, a very recent study concludes "TBI in older veterans was associated with a 60% increase in the risk of developing dementia over 9 years after accounting for competing risks and potential confounders. Our results suggest that TBI in older veterans may predispose toward development of symptomatic dementia and raise concern about the potential long-term consequences of TBI in younger veterans and civilians…Other risk factors examined include depression, posttraumatic stress disorder (PTSD), and cerebrovascular disease (CVD)." Traumatic Brain Injury and Risk of Dementia Older Veterans, Deborah E. Barnes, Ph.D. et al, Neurology 83 July 22, 2014; see also Rowland, Merritt's Neurology, 11th ed. (2005), p. 775, Table 107.3.*

*Research shows that "neurotrauma is a provocative agent in the development of AD and severs support to the association between TBI and AD at the statistical, theoretical, and biological level. Lye et al., Traumatic Brain Injury as a Risk Factor for Alzheimer's Disease: A Review, Neuropsychology Review, vol. 10, no. 2 (2000), pp 119, 125. "The brains of patients with TBI have histopathogenic features of Alzheimer disease, and patients with TBI are more likely to develop Alzheimer disease, of which one component is brain atrophy … TBI results in chronic degeneration. MacKenzie et al., Brain Atrophy in Mild or Moderate Traumatic Brain Injury, 23 Am. J. Neuroradiol 1509-1515 (Octo 2002), p. 1514.*

*"World War II veterans with documented head injuries were assessed for dementia more than 50 years later. Those who had moderate to severe TBIs as young men had higher prevalence of Alzheimer's disease than did veterans without TBI." Lezak et al., Neuropsychological Assessment, 4th ed. (2004), p. 209. "[P]laying professional football is associated with a significantly higher risk of permanent brain damage," including dementia. Amen et. al., Impact of Playing American Professional Football on Long-Term Brain Function, J Neuropsych Clin Neurosci 23:1 (Winter 2011), pp 103-04.*

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

*"Previously, postmortem histopathologic analysis of brains from boxers with dementia pugilistica ("punch-drunk syndrome") revealed neurofibrillary tangles and diffuse plaques composed of amyloid-β peptides (Aβs) similar to the hallmark lesions of Alzheimer disease (AD). Subsequently, a single incident of brain trauma was shown to induce the formation of Aβ peptides has been found in the cerebrospinal fluid of brain-injured patients. Smith et al., Diffuse Axonal Injury in Head Trauma, J Head Trauma Rehab, vol. 18, no. 4 (2003), p. 310…*

*It is well settled that premorbid psychiatric conditions are associated with increased risk of a prolonged recovery from concussion…*

*Pursuant to West Virginia Code § 33-6-31e(b)(1)-(6), your first party insured referenced above is requesting Safeco Insurance Company of America to waive subrogation, consent to settlement and agree to a Release of the tortfeasor to the extent of any financial contribution.*

*Pursuant to West Virginia Code § 33-6-31e(b)(7), please be advised that under the laws of the State of West Virginia, Safeco Insurance Company of America as the underinsured motorist coverage carrier has sixty days to preserve its subrogation rights against the tortfeasor, James Beck, by providing written notice of its intention to do so and by paying to the claimant and your insured, Mrs. Maura Kreitzer, an amount equal to the policy limits that have been offered to the claimant and your insured, the liability insurance company, indemnifying the tortfeasor, James Beck.*

*Please also set forth Safeco's position regarding constructive exhaustion. As you are aware, the West Virginia Supreme Court of Appeals resolved "whether the exclusionary language, which directs [the] insured to exhaust all applicable policies of liability."*

In response, Safeco only consented to the settlement but did not expressly waive subrogation. This falls well below industry standards.

Accordingly, on **October 24, 2022**, plaintiff's counsel writes:

*I am perplexed by Liberty Mutual and Safeco's position regarding this matter. The issue of whether or not Liberty Mutual and Safeco Insurance intend to waive subrogation is unresolved.  Consent is meaningless*

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

> *without a waiver of subrogation insofar as waiver is necessary for the policyholder to pursue a UIM claim.*
>
> *Please state whether or not Liberty Mutual and Safeco Insurance waive their right to subrogation…*

On **October 27, 2022**, Safeco's Marissa Culbertson wrote to plaintiff's counsel stating the following:

> *Thank you for discussing your client, and our Insured, Maura Kreitzer's, Underinsured Motorist Bodily Injury claim with me today.*
>
> *Per our discussion, we have extended an offer of $4,000.00 for her Underinsured Motorist Bodily Injury claim. Please be advised that this offer takes into consideration that State Farm has offered a settlement amount of $45,000.00 (which substantially exhausts their $50,000.00 in Bodily Injury coverage limits) and our $1,000.00 in Medpay benefits that have already been paid.*
>
> *Please allow this correspondence to confirm that we have decided to waive subrogation interests on this claim, as well.*
>
> *I have requested a copy of your client's Declaration's Page, to confirm her Underinsured Bodily Injury limits of $25,000.00 per person / $50,000.00 per accident. As soon as I receive that Declaration's Page, I will forward it to your attention.*
>
> *Please let me know how you wish to proceed with this case, once you speak with your client, pertaining to our $4,000.00 Underinsured Motorist Bodily Injury offer.*

Clearly, as will be further evidenced later in this report, this was a low-ball offer.

The $4,000 offer was arbitrary and had no reasonable basis. As will be demonstrated later in this report, the offer did not bear any reasonable relationship to the actual value of the insured's claim.

Claim professionals are trained to understand that unlike claims in which the injured claimant is a third party, in UIM claims the injured claimant is the insured and thus the coverage is contractual in nature. This is an important distinction as it changes the

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

relationship as well as the associated duties between the injured claimant and the insurance company handling the claim.

Unlike third-party injury claims, this contractual relationship enables the insurance company to conduct a virtually unfettered investigation and evaluation of the claim. In this regard, relative to first-party injury claims insurance companies contractually reserve the right to promptly, thoroughly and fairly investigate the injured insured's damages. The policy contract, under the potential penalty to losing coverage, holds that insureds seeking UM/UIM benefits must, inter alia, authorize the carrier to obtain medical records, lab results, or medical reports, submit to physical or mental examinations, interviews and recorded statements, and even examinations under oath.

Safeco, therefore, had a contractual right and ability to obtain whatever information it deemed necessary so as to promptly, thoroughly and fairly investigate, evaluate and pay policy benefits in accordance with its contractual promise. Accordingly, in this UIM claim it is disingenuous should Safeco allege that it was unable to properly pay what it owed because it lacked sufficient information to evaluate the claim.

On **October 31, 2022**, Marisa Culbertson sent an email to the insured's attorney attaching the Declaration's Page pertaining to Maura's coverage confirming her UIM limits of $25,000.00 per person / $50,000.00 per accident.

On **October 31, 2022**, plaintiff's counsel wrote to Safeco's Marisa Culbertson, stating:

> *Thank you for your October 31, 2022 email. Please allow this letter to document and memorialize our recent telephone conversation. Thank you for providing a copy of our client's declarations page. Additionally, we requested that you provide our office with the UM/UIM selection rejection forms. When you have obtained these documents, please provide copies of the same along with the Important Notice required by W.Va. Code § 33–6–31d. Thank you for your anticipated cooperation in this regard.*
>
> *Also, I requested that you indicate in writing that the policyholder's insurer was waiving subrogation against the tortfeasor. My understanding is that your company already lost the intercompany arbitration regarding the medical payments coverage of $1,000. Please confirm the same in writing.*
>
> *Obviously, we were not party to the intercompany arbitration between State Farm and Liberty Mutual, nor do we understand the terms of the*

## SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

*arbitration or the extent of the rulings. If you are willing to provide the intercompany arbitration materials to our office for our review, we would appreciate the materials.*

*Please indicate whether Liberty Mutual and Safeco are waiving subrogation against the tortfeasor. The ongoing refusal to document the same in writing prevents our office from accepting the settlement with the tortfeasor. W.Va. Code, § 33–6–31 et seq.; Postlethwait v. Bos. Old Colony Ins. Co., 189 W.Va. 532, 533, 432 S.E.2d 802, 803 (1993); Arndt v. Burdett[e], [189 W.Va. 722], 434 S.E.2d 394 (1993); State ex rel. Allstate [Ins. Co. v. Karl, [190 W.Va. 176, 437 S.E.2d 749 (W.Va. 1993). My understanding from our most recent conversation was that you had no objection to providing this to our office. Have you changed your mind? Is your manager or supervisor prohibiting you from doing this? Please help me explain to our client the reason for the delay in her settlement.*

*I also requested that you reduce Liberty Mutual and Safeco Insurance companies' settlement offer of $4,000.00 to writing and explain your analysis and the factual basis for your valuation. Not only did you not do that, you did not extend this offer in writing. Has Liberty Mutual and Safeco withdrawn its settlement offer?*

*Because you neither indicated that Liberty Mutual and Safeco are waiving subrogation against the tortfeasor nor reduced the settlement offer to writing, it is unclear whether Liberty Mutual and Safeco have withdrawn the settlement offer and intend to seek subrogation against the tortfeasor. Please clarify the corporate position regarding these matters.*

*Irrespective of the same, please allow this correspondence to memorialize that out client is unwilling to accept the sum of $4,000 as full and final settlement of her underinsured motorist coverage claim. This sum is profoundly inadequate.*

In a letter dated **November 4, 2022**, Marisa Culbertson wrote plaintiff's counsel the following:

*This confirms receipt of your correspondence, dated October 31, 2022.*

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

*In response to the questions you have asked, in your correspondence, please allow the following information to answer your questions:*

*1. This confirms that you have received the Declaration's Page we sent over, confirming your client had a $25,000.00 per person / $50,000.00 per accident Underinsured Motorist Bodily Injury policy at the time of the loss. I will work on obtaining the selection/rejection form on our end. If it's something you would like to obtain on your end, your client's Insurance Agent at the time of loss was Citywide Insurance and Financial Services and their phone number is 304-242-7500. They, too, would have a copy of what you are requesting. However, I will look into on my end as well.*

*2. This confirms, again, that we are waiving subrogation against the Tortfeasor. I apologize if that was not clear in my prior correspondences to your office.*

*3. We are unable to provide the Arbitration ruling/information, on our end, as it is company material.*

*4. The email correspondence to your office, on October 27, 2022, did confirm, in writing, our offer of $4,000.00 for your client's Underinsured Motorist Bodily Injury claim. We discussed the merits of the case on the phone, during our call on October 27, 2022. Our offer is based off of Special Damages of about $37K - $38K, no Wage Loss claim presented, and treatment from 3/21/2018 to 12/20/2021, which was primarily conservative. Your client did obtain 2 injections. Her diagnostics were negative, and she didn't begin treating for the TMJ injury until November 2020, which was about 2.5 years post loss. We also took into consideration the appropriate offsets, from the Tortfeasor's settlement with you and your client.*

*5. Thank you for letting me know your client rejects the $4,000.00 Underinsured Motorist Bodily Injury settlement offer that we have offered. If you have a counter demand/response to our offer, please let me know. I would be more than willing to discuss the case further with you.*

*Again, please contact me if you have a counter demand/response to our $4,000.00 Underinsured Motorist Bodily Injury settlement offer. I am more than willing to discuss the case further with you and continue*

# SETCAVAGE CONSULTING LLC

> *negotiations. If you and your client wish to file a lawsuit in this matter, please send me a courtesy copy for my file.*

Relative to this response, it is not the insured's responsibility to evaluate their own claim. Again, this is a first-party claim. Promptly, thoroughly and fairly investigating, evaluating and paying the claim in accordance with its contractual promise is the role of the insurance company, not the insured. Whether an insured chooses to be represented by another does not substantively change the contractual relationship or the duties of either party.

Here, Safeco is admitting that they know of about two and one-half years of treatment, and about $37,000-$38,000 of medical expenses. However, its evaluation of the claim value of $50,000 does not reasonably reflect these facts.

On **November 8, 2022**, plaintiff's counsel writes as follows:

> *Thank you for your October 27, 2022 letter which was received by our office on November 7, 2022. Frankly, I am disappointed by the manner in which this claim has been handled and the manner in which Ms. Kreitzer is being treated by her insurer. An insurer is in a position to take advantage of an insured's misfortune by bargaining for settlement or resolution of the claim for less than the true amount owed. The insurer has control over the investigation, evaluation, processing, and denial of the claim. The insurer also has superior knowledge and spending power following a loss. This unequal power creates an enhanced duty on the insurer to place the interests of its insured at least equal as its own. "The insurance company must take into account the interest of its insured and give its insured's interest at least as much consideration as it gives its own interest." Shamblin v. Nationwide Mut. Ins. Co., 183 W. Va. 585, 593, 396 S.E.2d 766, 774 (1990).*
>
> *Part of every policy is a promise that the parties will deal fairly with one another. This implied covenant of good faith and fair dealing requires that neither party do anything to impact the right of the other to receive the benefit of the agreement. When an insured purchases insurance, part of what s/he pays for is a reasonable and even-handed investigation. It is the duty and responsibility of the insurer to investigate. It is the insured's responsibility to cooperate with the investigation, not to undertake the*

*investigation or incur the cost. This duty to investigate is central to proper claim handling.*

*The first party claims process is not adversarial. The AIC (Associate in Claims) textbook, The Claims Environment, explains this principle by acknowledging that when an insured purchases insurance, part of what is paid for is a reasonable and even-handed investigation. Markham, First Edition, 1993.*

*This tenant is central to proper claim handling,*

*In a claim adjustment process, the claim is investigated, coverage and liability are determined, damages are measured, and if necessary, the claim is litigated. These tasks are carried out either by staff employees of the insurance company or by outside claim – adjusting services. Professionals and specialists in various fields, as well as fellow employees in the insurance company, also lend their support to the process. Markham, The Claims Environment, First Edition, 1993, p. 27.*

*"The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims." Id. at p. 13. The text goes on later to state, "Good faith claim practices require that this investigation be objective, thorough, and timely." Id. at p. 29.*

I agree with the sentiments expressed in this letter. I own, and have read this insurance textbook and, in fact, cite it often. This text is part of what insurance professionals are trained to understand in our industry.

A Complaint was filed in the Circuit Court of Ohio County, West Virginia on **November 4, 2022** against Safeco Insurance Company of America, Liberty Mutual Insurance Company and Marisa Culbertson. The Complaint alleges Defendants Liberty Mutual and Safeco were provided adequate information to value the plaintiff's policy limits claim for underinsured motorist coverage but refused to pay the claim. The Complaint specifically alleges breach of contract, common law bad faith and statutory bad faith pursuant to West Virginia Code § 33-11-4(a).

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

Liberty Mutual and Safeco removed this action to federal court. Plaintiff's Motion to Remand was denied. Discovery commenced. Plaintiff produced a second copy of all pertinent records (crash report, medical records and medical bills) as 26(a)(1) disclosures.

Attempts to negotiate payment of the UIM claim directly with defendant's counsel were unsuccessful, thus forcing the plaintiff's counsel to retain expert witnesses and proceed forward to trial.

In anticipation of trial, plaintiff's counsel retained a neuropsychological expert to testify regarding plaintiff's traumatic brain injury and PTSD and a PMRS to testify regarding the plaintiff's physical injuries and to generate a comprehensive Life Care Plan.

On **June 10, 2024**, Maura Kreitzer traveled to Charleston, West Virgina where she was examined by Timothy Saar, PhD.

Dr. Saar performed a Forensic Psychological Evaluation and concluded based upon the DSM-5-TR diagnostic criteria that Mrs. Kreitzer suffers from (1) other specified trauma and stressor related disorder; and (2) mild neurocognitive disorder. He further concluded that she requires future medical care and treatment including, inter alia: counseling weekly for the next year, reducing it to bi-weekly the second year, and then quarterly for five (5) years; Consultation with Neuro-Optometric Rehabilitation Therapy Provider.

Dr. Saar prepared a comprehensive report of his neuropsychological findings and his recommendations for future medical care and treatment. These were shared with defendants Liberty Mutual and Safeco on **September 24, 2024**.

Following receipt of Dr. Saar's report counsel for Liberty Mutual and Safeco writes: *" ... My client remains interested in resolution. I had inquired previously if the policy limits of $25,000 would potentially resolve things. I don't have the authority to offer it at this time; however, if I could represent to the client that it is certain such an offer would resolve the matter, it would increase the chances I could get it. Let me know your thoughts.*

On **July 29, 2024**, Ms. Kreitzer was evaluated by Dr. Richard G. Bowman, M.D., DABPMR, DABPM, FIPP, CEDIR, CLCP.  Dr. Bowman's assessments are as follows:

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

1. Status post motor vehicle collision on 03/21/18 resulting in multiple conditions and permanent disabilities;

2. Status post incurrence of collision-related post-concussion syndrome with associated posttraumatic headaches and vestibular dysfunction;

3. Status post incurrence of collision-related post-concussion syndrome with associated mild neurocognitive disorder and stressor related disorder;

4. Status post incurrence of collision-related permanent fibromyalgia exacerbation with associated cervicalgia, ongoing right neck pain, and associated right upper extremity weakness;

5. Status post incurrence of collision-related post-concussion syndrome with associated ongoing balance deficits necessitating prior received vestibular therapies;

6. Status post incurrence of collision-related TMJ (resolved).

Dr. Bowman's recommendations are as follows:

1. Ms. Kreitzer will require future physical therapy for the right upper extremity. The weakness associated with chronic pain will worsen over time due to immobility and the compounded deleterious effect of aging with disability. The therapy regimens will serve to partially mitigate the effects of relative immobility on her upper extremity function.

2. Ms. Kreitzer will require future vestibular therapy regimens since her balance deficits will result in reduced mobility over time and put her at an increased fall risk. Because of the compounded deleterious effect of aging with disability, future therapy regimens will serve to partially mitigate the effects of relative immobility on her gait and balance.

3. Ms. Kreitzer will require psychological treatment as recommended by Dr. Saar including individual therapy once weekly for one year, biweekly individual therapy visits for one year, followed by visits four times per year for five more years. Family therapy once weekly for six months will be needed.

4. Ms. Kreitzer will require a neuro-optometry consult, per Dr. Saar.

SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

5. Ms. Kreitzer will need to establish and maintain care with a physiatrist to manage her chronic disabilities. She should expect to need seen at least yearly.

6. Ms. Kreitzer will require ongoing pain care for the permanent exacerbation of fibromyalgia resulting in increased right neck and shoulder area pain. Her treatment regimen of medical marijuana (which is also used for her anxiety exacerbation diagnosed as stressor related disorder) will need continued ongoing. Although this medication provides consistent pain relief, it does not return her pain to its pre-collision baseline. The addition of approximately three to four massage visits monthly will be needed to help reduce the pain and return it close to baseline at rest.

7. Ms. Kreitzer will require ongoing help with household duties four days weekly from neck pain flareups following work. These needs will persist ongoing and were not required prior to the collision. She will also need deep cleaning service assistance approximately two hours monthly ongoing to perform scrubbing duties she completed independently prior to the collision.

8. Ms. Kreitzer may benefit from a vocational rehabilitation consult. She will more likely than not decline functionally over time. Her current lifting limit is 30 pounds or less, and this will decline with time.

Dr. Bowman estimates the cost of the life care plan at **$696,468.81**. His life care plan report was forwarded to Liberty Mutual and Safeco by email dated **November 11, 2024**.

Liberty Mutual and Safeco had been unwilling to provide the modest available limits of $25,000 to the plaintiff for more than two years. However, finally, on **November 13, 2024**, Liberty Mutual and Safeco tendered the available $25,000 of UIM coverage.

Ultimately, although untimely, Safeco confirmed this was a bona-fide claim as the original reports submitted to it had indicated.

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

## IV.    SUMMARY AND CONCLUSIONS

Safeco's claim handling fell well below industry standards, caused delays, and was inherently unfair to its insured. In addition to the facts outlined herein, the following findings and observations are particularly germane to my professional opinions.

Safeco only had UIM limits of $25,000, and the tortfeasor's liability limits only provided a $50,000 set-off.

This is a first-party claim and Safeco had contractually reserved its right to conduct an unfettered investigation of the insured's damages so that it could promptly pay in accordance with its contractual promise.

However, no such investigation was done. Safco did not exercise its right to an examination until years later. Had a timely investigation been accomplished, Safeco would have been able to simply pay its relatively small policy limits. Accordingly, Safeco's investigation of this UIM claim does not constitute a reasonable investigation based upon **_all_** available information.

Claim professionals are trained that:

> *Investigations that are thorough, timely and unbiased are the foundation of good-faith claim handling.*[5]

> *When investigating claims, claim representatives should pursue all relevant evidence, especially evidence that establishes the claim's legitimacy, without bias.*[6]

The demand and supporting documentation was submitted to Safeco on September 26, 2022, relative to this first-party UIM claim. After not increasing its arbitrary low-ball offer of $4,000 for years, Safeco finally tendered the available $25,000 of UIM coverage on November 13, 2024, **two years, one month, and 18 days after receiving a comprehensive demand package**.

Instead, in violation of industry standards, Safeco maintained its denial of the policy limits claim for years. It obdurately stood on its offer of only $4,000,

---

[5] Popow, p. 5.25
[6] Popow, p. 5.26

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

without ever getting an examination of the insured done. From an insured's perspective, an unreasonably low offer is indistinguishable from a claim denial.

Without a proper investigation being done by the insurer, which is prompt, thorough, and fair, its ability to reach an accurate evaluation of the contractual benefits it owes is often impossible.

Claim professionals are trained to know that the duty to settle claims flows from the insurance carrier's contractual duties and the legal system's overarching goal to eliminate unnecessary litigation and to effectuate "just, speedy, and inexpensive" resolutions for all claimants.[7]

Industry standards and claim practices are based upon the *minimum* standards as recommended by the National Association of Insurance Commissioners (NAIC) and those adopted and codified by each state. "In an effort to bring uniformity to the standard of conduct to which insurers and claim representatives are held, the NAIC created the Model Unfair Claims Settlement Practices Act, which lists practices that are generally accepted as unfair claims settlement practices. Most states have adopted some or all the Model Act's provisions."[8]

> *"Violations of the Unfair Claims Practices Act are damaging even in states that do not allow them to be used as the basis for a bad faith lawsuit. Evidence of behavior that violates an act is likely also evidence of "malice", "reckless disregard", or "bad faith" necessary for bad faith lawsuits."[9]*

In this regard, industry standards[10] adopted in West Virginia specifically prohibit insurers from:

- o Failing to adopt *and implement* reasonable standards for the prompt investigation of claims arising under insurance policies; (emphasis added)
- o Refusing to pay claims without conducting a reasonable investigation based upon all available information;
- o Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

---

[7]  See FED. R. CIV. P. 1

[8]  AIC: *Claim Handling Principles and Practices*, 1st Edition, 7th Printing (Feb. 2011), p. 5.5 (Popow), The Institutes, Malvern, PA

[9]  AIC 30, *Claim Handling Principles and Practices*, 1st Edition 7th Printing (Feb. 2011), p. 5.16 (Popow), The Institutes, Malvern, PA

[10] ARTICLE 11. UNFAIR TRADE PRACTICES.§33-11-4. Unfair methods of competition and unfair or deceptive acts or practices defined.

- o Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;
- o Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;
- o Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Claim professionals are trained to understand that when handling first-party UIM claims such as this, the insurance company's duty of good faith and fair dealing, inherent and presumed in every insurance contract, survives a lawsuit and is only extinguished by the termination of the contract itself. Thus, when the insured is compelled to file suit because of an unfair offer, the insurer still must work diligently to investigate, evaluate and resolve that claim promptly and fairly.

Making a good faith attempt to settle a claim once liability has become reasonably clear prohibits insurance companies from abusing its inherent power in the claims and litigation process by using unreasonable delays to its advantage. In this regard, claim professionals are trained that,

> *Insurers and the claim representatives who work for them have a duty of good faith and fair dealing in claim handling. This requirement is imposed on insurers and claim representatives because of (1) the public interest in ensuring that insurers have the financial resources to pay claims and that they pay claims fairly and promptly, (2) the unequal bargaining power of the parties to the insurance contract, and (3) the insurer's control over the investigation and resolution of the claims. If the insurers or their claim representatives do not live up to the standard of good faith and fair dealing, they are said to be acting in bad faith.*[11]

---

[11] Popow, p. 5.34

# SETCAVAGE CONSULTING LLC

PITTSBURGH, PENNSYLVANIA
STU@SETCAVAGE.COM
(412) 260-4908

In this regard, claim professionals are trained to know that the insurer's contractual duties as well as its duties of good faith and fair dealing do not disappear once suit is filed. In fact, those duties become increasingly important.

Although rarely expressed, there is an inherent benefit to the insurance company to hold on to the money it otherwise owes as claim payments, and to do so for as long as possible. The collection and investment of premiums paid by policyholders for a period of time before that money is used to pay claims is known as "float."

Float drives the profitability of insurance companies. Perhaps this is best explained in an article about Warren Buffet and his comments about the significance of float to an insurance company's bottom line. (attached)

This claim could have and should have been paid shortly after Safeco received the demand for policy limits in September of 2022.

The professional opinions contained herein are made within a reasonable degree of professional certainty and are based upon my specialized and concentrated industry experience, knowledge, training, and education obtained during my nearly 36 years in the insurance claim handling industry.

Should additional information be provided to me for review, I reserve the right to supplement this report in the future as may be necessary.

Respectfully Submitted,

*Stuart J. Setcavage*

Stuart J. Setcavage, AIC, CCLA