**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**MAURA ANNE KREITZER,**

Plaintiff,

v.

**CIVIL ACTION NO. 5:22-CV-312**
Judge Bailey

**SAFECO INSURANCE COMPANY OF AMERICA,** a Liberty Mutual Company, **LIBERTY MUTUAL INSURANCE COMPANY,** and **MARISA CULBERTSON,**

Defendants.

# ORDER

Pending before this Court is Defendants' Motion for Summary Judgment [Doc. 67] and supporting Memorandum [Doc. 68], filed April 28, 2025. Plaintiff filed a Response [Doc. 74] on May 12, 2025. Defendants filed a Reply [Doc. 108] on May 23, 2025.

Also pending before this Court is plaintiff's Motion for Summary Judgment [Doc. 69], filed April 28, 2025. Defendants filed a Response [Doc. 72] on May 12, 2025. Plaintiff filed a Reply [Doc. 109] on May 23, 2025. On May 29, 2025, this Court heard oral argument on both Motions. [Doc. 78].

These matters are ripe for adjudication. Upon consideration of the merits of both Motions, defendants' Motion [**Doc. 67**] will be granted, and plaintiff's Motion [**Doc. 69**] will be denied.

## I. BACKGROUND

This case involves an insurance claim arising from a March 21, 2018 motor vehicle accident. *See* [Doc. 1-1]. Plaintiff was insured by Safeco Insurance Company of America ("Safeco") pursuant to Policy Number K2799758, with effective dates from October 17, 2017, to October 17, 2018. [Doc. 1-1 at ¶ 7; Doc. 68-1]. The policy provides underinsured motorist ("UIM") coverage in the amount of $25,000 per person. [Doc. 1-1 at ¶ 8; Doc. 68-1].

By letter dated September 26, 2022, counsel for plaintiff requested Safeco consent to a settlement of the underlying claim, waive its right of subrogation, and, evaluate the claim on behalf of its policyholder under the applicable UIM policy. [Doc. 68-3 at 1]. The September 26, 2022 letter further states the "settlement offer of $45,000 constructively exhausts the $50,000 policy limits of State Farm" and that plaintiff's counsel "maintain[s] that the value of [plaintiff's] claim far exceeds the $50,000 policy limits. . . ." [Id.]. The letter enclosed copies of plaintiff's pertinent medical records, medical specials total, medical bills, and the report of Dr. Alicia Trbovich. [Id. at 2]. On October 27, 2022, Safeco consented to the settlement, waived its subrogation interests, and made an offer of $4,000 to settle the UIM claim. [Doc. 68-5].

Based on Safeco's review, $37,785 of medical specials were submitted, and Safeco accepted $31,226.24. [Doc. 68-6]. After the accident, plaintiff received some treatment in 2018 related to a concussion diagnosis and treatment through 2019 for soft tissue injuries to her neck area. *See* [id.]. Plaintiff additionally had some treatment for a temporomandibular joint disorder ("TMJ") approximately 2.5 years after the accident that she alleged was caused by the accident, though Safeco did not consider this to be related

to the subject accident due to the significant passage of time and pre-accident TMJ diagnosis. [Id. at 5].

Prior to filing suit, plaintiff's counsel asserted that plaintiff had various issues related to the concussion such as deficits in memory, a decrease in intelligence, and other mental symptoms. [Doc. 68-3]. Plaintiff's counsel cited various studies and reports discussing the connection between concussions and decreased mental capacity. [Id.].

Safeco explained all of the above to plaintiff's counsel in connection with Safeco's $4,000 offer of October 27, 2022. [Doc. 68-9]. Plaintiff rejected the offer, and, instead, filed this action on November 14, 2022, just seven (7) weeks after notifying Safeco and requesting that Safeco consent to the underlying settlement and just two-and-a-half weeks after Safeco made its $4,000 offer to settle the UIM claim. Plaintiff alleges a breach of contract for UIM proceeds, violations of the Unfair Trade Practices Act ("UTPA") and common law bad faith. *See* [Doc. 1-1].

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a

genuine issue for trial." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Id.*** "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." ***Id.*** at 250.

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See* ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Id.*** at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323–25; ***Anderson***, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." ***Anderson***, 477 U.S. at 249 (citations omitted). Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." ***Beale v. Hardy***, 769 F.2d 213, 214 (4th Cir. 1985). Further, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." ***Celotex Corp.***, 477 U.S. at 322.

When cross-motions for summary judgment are before a district court, as here, the same standards of review are applied. ***ITCO Corp. v. Michelin Tire Corp.***, 722 F.2d 42, 45 n.3 (4th Cir. 1983). Each motion must be considered individually on its own merits, and the facts relevant to each must be viewed in the light most favorable to the non-movant. ***Mellen v. Bunting***, 327 F.3d 355, 363 (4th Cir. 2003) (citing ***Rossignol v. Voorhaar***, 316 F.3d 516, 523 (4th Cir. 2003)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion. ***Rossignol***, 316 F.3d at 523 (quoting ***Wightman v. Springfield Terminal Ry. Co.***, 100 F.3d 228, 230 (1st Cir. 1996)).

## III. ANALYSIS

### A. Breach of Contract Claim Arising from UIM Policy

Safeco argues plaintiff's breach of contract claim arising from the UIM policy is settled, and judgment should be entered on this claim in the amount of $25,000, with a judgment in Safeco's favor regarding any additional damages. [Doc. 68 at 12]. Safeco asserts on November 13, 2024, Safeco offered $25,000 on plaintiff's UIM claim, and plaintiff accepted the same. [Id.]. Safeco goes on to note that the parties memorialized this settlement in the Joint Motion to Amend Scheduling Order filed on December 11, 2024. [Doc. 48 at ¶¶ 7; 11 ("The Parties have resolved Plaintiff's claim for policy proceeds, leaving Plaintiff's claims for extracontractual damages and bad faith[;]" "Given the Parties' success at resolving Plaintiff's underlying policy claim, the Parties remain interested in

exploring the potential resolution of the matter in full in advance of expending additional resources on discovery."). At oral argument, plaintiff's counsel confirmed the language of the Joint Motion was reviewed prior to filing.

Safeco asserts that despite numerous requests by counsel for Safeco for the information necessary to issue the relevant check, plaintiff's counsel has not provided the information. [Doc. 68-15]. Safeco notes it "stands by, ready to issue the $25,000 check once the instructions for the same are provided." [Doc. 68 at 12].

This Court relied on the parties' assertions that they had "success at resolving Plaintiff's underlying policy claim" when deciding to grant the Joint Motion and amend the Scheduling Order. [Doc. 49]. The language of the Joint Motion is clear: the claim for policy proceeds is resolved. As such, plaintiff's arguments regarding reformation of the UIM policy are unavailing.

Based on the foregoing, plaintiff has no claim for UIM proceeds beyond the $25,000 to which the parties agreed. Judgment will be entered on the breach of contract claim in the amount of $25,000, and judgment will be entered for defendants for any amount in excess of the same. Plaintiff is **DIRECTED** to provide Safeco with the information necessary for the check to be written and processed within **one (1) week** of the entry of this Order.

**B. *Hayseeds* Damages**

As this Court is of the opinion the breach of contract claim arising from the UIM policy is resolved, the question of whether plaintiff is entitled to ***Hayseeds*** damages is ripe. Defendants argue they are entitled to judgment as a matter of law on plaintiff's claim for

***Hayseeds*** damages, as plaintiff did not "substantially prevail" on her UIM claim. [Doc. 68 at 12–17].

"When an insured purchases a contract of insurance, he buys insurance—not a lot of vexatious, time-consuming, expensive litigation with his insurer." ***Hayseeds, Inc. v. State Farm Fire & Cas.***, 177 W.Va. 323, 329, 352 S.E.2d 73, 79 (1986). Therefore, under West Virginia's ***Hayseeds*** doctrine, extra-contractual damages are available where an insured "substantially prevails" in litigation to recover insurance policy proceeds, if the insured was forced to engage in litigation to recover those benefits. ***Hayseeds***, 177 W.Va. at 329, 352 S.E.2d at 80; ***Lemasters v. Nationwide Mut. Ins. Co.***, Syl. Pt. 2., 232 W.Va. 215, 751 S.E.2d 735 (2013) (per curiam).

> An insured "substantially prevails" in a property damage action against his or her insurer when the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action, as well as when the action is concluded by a jury verdict for such an amount. In either of these situations the insured is entitled to recover reasonable attorney's fees from his or her insurer, as long as the attorney's services were necessary to obtain payment of the insurance proceeds.

Syl. Pt. 1, ***Jordan v. Nat'l Grange Mut. Ins. Co.***, 183 W.Va. 9, 393 S.E.2d 647 (1990).

"When examining whether a policyholder has substantially prevailed against an insurance carrier, a court should look at the negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds." Syl. Pt. 4, ***Miller v.***

***Fluharty***, 201 W.Va. 685, 500 S.E.2d 310 (1997). This "totality of the negotiations" approach does not require a first-party policyholder to make a demand of their insurance carrier prior to initiating litigation. ***Id.*** at 696, 500 S.E.2d at 321. Damages available pursuant to ***Hayseeds*** "were extended to first-party claims concerning uninsured and underinsured motorist coverage in ***Marshall v. Saseen***, 192 W.Va. 94, 450 S.E.2d 791 (1994)." ***Id***. at 694, 500 S.E.2d at 319.

One of the arguments asserted by defendants is that plaintiff never made a demand; thus, defendants were deprived of an opportunity to settle the UIM claim prior to litigation. [Doc. 68 at 14]. Plaintiff asserts she demanded policy limits to settle the UIM claim. [Doc. 74 at 15]. This demand is reflected in an October 27, 2022 claim file entry prepared by defendant Marissa Culbertson. [Doc. 69-5]. The plain language of the claim entry states "[w]e received UIM demand for policy limits." [Id.]. Accordingly, this Court believes plaintiff demanded policy limits, thus satisfying an initial threshold for an award of ***Hayseeds*** damages.

As for the October 27, 2022 offer, Safeco advised plaintiff's counsel why its $4,000 offer was supported by the information then available to it. Safeco spoke with plaintiff's counsel and sent correspondence regarding the offer and the reasoning for the same. [Docs. 68-5 & 68-9]. Safeco further invited plaintiff's counsel to respond to Safeco's offer to allow them to continue discussions. [Doc. 68-9 at 3]. Instead, plaintiff's counsel rejected the offer and indicated that a lawsuit would be forthcoming. [Id. at 1]. Plaintiff then filed suit less than two (2) months after the settlement with the underlying tortfeasor, and around two (2) weeks after receiving Safeco's offer. [Docs. 1, 68-5 & 68-9].

At no time prior to filing suit did plaintiff provide any additional information regarding her claim. While Safeco had enough information to justify the offer it made, it did not have enough to justify what it ultimately paid. This is not due to any fault of Safeco, but is instead due to the information plaintiff had not yet provided.

Plaintiff's medical records reveal she ended treatment for the injuries alleged to have been caused by the accident. Further, her medical records revealed someone that was largely healed from any alleged injuries. In fact, when plaintiff made her UIM claim in September 2022, plaintiff's final claimed treatment from the accident other than for TMJ was in December of 2019. [Doc. 68-6].

Plaintiff's counsel, pre-suit, cited studies that linked an increased risk in individuals with concussions to depression, post-traumatic stress disorder, dementia, and other neurological issues. [Doc. 68-3]. Plaintiff's medical records did not identify any such increased risk for plaintiff, however, and plaintiff's medical records did not indicate that she was suffering such conditions. [Doc. 68-6].

Plaintiff saw Dr. Alicia Trbovich, formerly Dr. Alicia Sufrinko, for her concussive symptoms from April 2, 2018, to November 9, 2018. [Id. at 3]. On November 9, 2018, Dr. Trbovich noted: "Cognitive symptoms have resolved [for] the most part. Problems reading were denied. Denied sleep onset/maintenance problems. Mood was described as better now that she is able to do more things with her family and enjoy her free time. Emotional systems on day to day basis denied. Physical activity more consistent walks now. Working full time without restriction." [Doc. 68-7 at 2]. On that same day, Dr. Trbovich additionally noted:

> Maura is 9 months post concussion and still has some mild vestibular sensitivities and cognitive fatigue by the end of the day. Her mood is much better and she has returned to several activities that she was previously limited on. Scores on neurocognitive testing have also improved and she is in the average range across domains. Anticipate she will continue to improve and reach full recovery with ongoing therapy and progressive return to day to day activities.

[Id. at 3–4]. Records reveal that plaintiff never treated with Dr. Trbovich again. [Doc. 68 at 5].

Plaintiff underwent physical therapy for injuries related to the accident beginning in April of 2018. [Doc. 68-6 at 4]. On September 22, 2019, her physical therapist discharged plaintiff because she did not return after her previous visit on August 22, 2019. [Doc. 68-8]. After that date, plaintiff did not receive, nor did she seek any additional physical therapy. [Doc. 68-6 at 4].

In discovery, plaintiff produced a report generated by Dr. Paul D. Nussbaum pursuant to an independent medical evaluation conducted at the behest of State Farm in the underlying litigation. [Doc. 68-10]. Within this Report, Dr. Nussbaum opined, among other things, that:

> The following opinions are made with a reasonable degree of neuropsychological certainty:
>
> 1. Ms. Kreitzer was involved in a MVA 3-12-18. Records indicate she did not hit her head, did not LOC, and was neurologically normal the

day of the MVA per ED records. She may have suffered a concussion and if so, it was mild.

* * *

6. Ms. Kreitzer has recovered from any neuropsychological deficits or limitations that might have been caused by the 3-21-18 MVA as it was more than 4 years ago.

7. Ms. Kreitzer is depressed and anxious though these symptoms are chronic in nature with a sense of feeling overwhelmed dating well before 2018. She can benefit from psychotherapy (individual and possibly marital) and a psychiatric consultation for medication. Once again, this treatment is not related to the MVA of 3-21-18 but rather to a near lifelong struggle with mood disorder.

[Doc. 68-10 at 39].

Safeco further obtained a copy of plaintiff's July 20, 2021 deposition taken in the underlying action. In that testimony, plaintiff confirmed that she had been experiencing tension headaches from 2010 or 2011, some seven (7) or eight (8) years prior to the accident. [Doc. 68-11 at 15:18–16:10]. Plaintiff also testified that it had been suggested to her that she had TMJ pre-accident, but that she had not received treatment for it pre-accident. [Id. at 40:1–12].

When questioned about the alleged cognitive issues that she attributed to the accident, plaintiff testified in her pre-UIM claim deposition that she was very emotional and "very easily moved to tears" for the first couple of weeks after the accident. [Id. at 31:16–25]. She also testified that in the weeks following the accident, she "couldn't think

as quickly" and "couldn't problem solve things as quickly" and "wasn't feeling as sharp" as she normally did. [Id. at 31:25–32:4]. But, when asked about any continuing cognitive issues at the time of that deposition, almost three (3) years post-accident, plaintiff acknowledged that she was no longer treating for any concussion-related symptoms. [Id. at 32:12-21].

Even when questioned by her own attorney about the impact the accident had on her cognitive ability, plaintiff denied additional symptoms:

> Q. And has your brain injury made it difficult for you to specifically recall clear events and articulate events that have happened to you?
>
> A. I don't think so. I mean, it takes me maybe more time, but I recall everything very clearly. It just takes me a minute to put it into words because there's a lot of emotions attached to the event so it just takes me a minute to get it out, but no, I recall things incredibly vividly.

[Id. at 49:19–50:2].

In the litigation against the tortfeasor, plaintiff was also questioned about any impact the accident had on her marriage. In 2021, she testified:

> Q. Is your marriage still strong?
>
> A. Yes, but it's -- I mean, any marriage is hard at the best times, but it's just added a lot of stress, and I –
>
> Q. Have you had to have any kind of marriage counseling or anything like that?
>
> A. My husband's a therapist. We can't really -- we can't really go see a marriage counselor in Wheeling. He's a therapist. No, we read, and we talk,

> and we -- we've both worked with therapists and we know the work we need to do.

[Id. at 48:16–49:1].

Then, in a later deposition, plaintiff argues her earlier testimony was wrong:

> I was not prepared for that deposition. I didn't know. I had no idea what to expect. They had planned a deposition prep and all of them in the past had been over Zoom because of COVID. It had been canceled numerous times due to COVID.
>
> And then it was under my impression that that was going to be under Zoom as well, and it wasn't. So, like, I had no -- I met my lawyer – first of all, my lawyer changed about three times.
>
> How many times did my lawyer change? I don't remember. But, like, I didn't -- I didn't get the chance to talk to him about anything. I didn't know what to do. I didn't know what to prepare for.
>
> And honestly, every day, I was pretending. Every day. If I could pretend that some things in my life were okay, I could get through the rest of it.

[Doc. 68-12 at 129:22–130:15].

Information alleging the need for additional treatment was not provided until two (2) years after this litigation had been instituted, and over six (6) years after the accident. The nature of plaintiff's alleged injuries dramatically changed between September of 2022

and when the reports offered by Dr. Timothy Saar[1] and Dr. Bowman[2] were provided in September and November 2024, respectively.

Dr. Saar and Dr. Bowman's assessments of plaintiff varied markedly from everything Safeco had previously seen and concluded regarding plaintiff's claim. Nevertheless, on November 13, 2024, just two (2) days after receipt of Dr. Bowman's report, Safeco advised plaintiff that Safeco would pay $25,000 to resolve plaintiff's UIM claim. [Doc. 68-15]. Plaintiff accepted the offer as revealed by a filing with this Court. [Doc. 48].

It is not reasonable to require an insurer to foresee changes in an insured's condition six (6) years after the subject accident and in direct contradiction of their treating records. The Supreme Court of Appeals of West Virginia has held that when an insurance company is not totally informed of the nature of its insured's injuries, a lower offer made based on that limited knowledge does not support a finding that the insured "substantially prevailed" when receiving more after the insured reveals more about the claim. ***Bryan v. Westfield Ins. Co.***, 207 W.Va. 466, 534 S.E.2d 20 (2000). In ***Bryan,*** Westfield made an

---

[1] Dr. Saar diagnosed plaintiff with "Other Specified Trauma- and Stressor-Related Disorder" and "Mild Neurocognitive Disorder." [Doc. 68-13 at 13]. Dr. Saar attributed an alleged cognitive decline in the areas of "complex attention, immediate/ recent memory, and perceptual motor function" to the motor vehicle accident. [Id. at 14]. Dr. Saar recommended that plaintiff undergo individual counseling for seven (7) more years and family therapy for six (6) months. [Id. at 15]. Dr. Saar also recommended a neuro-optometric rehabilitation consultation. [Id.].

[2] Approximately six (6) weeks later, on November 11, 2024, plaintiff provided Dr. Bowman's Report. [Doc. 68-14]. Dr. Bowman also estimated the cost of that additional treatment and of the treatment recommended by Dr. Saar. [Id. at 23–28]. Dr. Bowman estimated that plaintiff's life care plan based on his and Dr. Saar's recommendations totaled just shy of $700,000. [Id. at 19].

offer of $15,000 to resolve an insured's claim based on the information then available. ***Id.*** at 467, 534 S.E.2d at 21.

Through discovery and nearly six (6) months after the initial offer, the insured produced an MRI that revealed nerve damage that had not previously been able to be considered by Westfield. ***Id.*** Within eight (8) days of receiving this new medical report, the insurer more than tripled its offer. ***Id.*** at 467–68, 534 S.E.2d at 21–22. The Supreme Court of Appeals affirmed the Circuit Court of Ohio County's entry of summary judgment for Westfield. According to the Supreme Court of Appeals, while it was true that a prior settlement offer was below the amount ultimately offered by the insurer, that "was made, however, before Westfield Insurance Company was totally informed of the nature of [Plaintiff's] medical condition, and a considerable time before Westfield Insurance Company was aware of the fact that [Plaintiff] had suffered nerve impingement as a result of the accident. ***Id.*** at 468, 534 S.E.2d at 22.

Safeco made an initial offer based on medical evidence that they had at the time and evidence that was dramatically supplemented two (2) years later. This Court refuses to hold Safeco to a standard of omniscience and clairvoyance and charge Safeco with knowing things that plaintiff had not yet told it, and perhaps things which had not yet even occurred. Safeco promptly reviewed and re-evaluated the claim based on the additional information provided by plaintiff and adjusted its own offer to reflect the new information.

Further, the United States Court of Appeals for the Fourth Circuit has indicated that ***Hayseeds*** damages are only available when an insurer has denied its insured's UIM claim. ***Raszkiewicz v. Progressive Max Ins. Co.***, 2025 WL 1177259, at *2 n.* (4th Cir. Apr. 23,

2025) (per curiam) (internal citation omitted). Safeco never flatly denied coverage to plaintiff. There is simply no argument that Safeco ever denied plaintiff coverage, or that plaintiff was required to sue defendant to vindicate a right to coverage as contemplated by the ***Hayseeds*** opinion. Considering the negotiations as a whole, such a timeline does not support a finding that plaintiff "substantially prevailed." Accordingly, defendants are entitled to judgment as a matter of law on plaintiff's claim for ***Hayseeds*** damages.

**C. Common Law Bad Faith**

As presented in plaintiff's Motion, the following points support her common law bad faith claim against defendants:

(1) Safeco performed an inadequate analysis of critical medical evidence by failing to investigate the permanency of Mrs. Kreitzre's [sic] injuries and future medical costs;

(2) Safeco neglected to investigate how Mrs. Kreitzer's injuries affected her life;

(3) Safeco neglected to evaluate Mrs. Kreitzer's claim under the "typical jury award" standard required for UIM claims;

(4) Safeco neglected to refer the claim to its complex claim division and had adjusters and managers who lacked appropriate training to evaluate traumatic brain injury cases despite actual knowledge of the severity of Mrs. Kreitzer's injuries;

(5) Safeco materially misrepresented the amount of medical specials it was considering in its November 4, 2022 letter which states "Special Damages

> of about $37K–$38K" while internally reducing accepted specials to $31,226.24;
>
> (6) Safeco made a lowball $4,000 settlement offer that necessitated that plaintiff hiring her own expert medical witnesses and conducting her own investigation of the claim at her expense;
>
> (7) Safeco ignored Dr. Saar's medical opinion that the crash caused plaintiff to require future medical care and treatment and his diagnosis of (1) Other Specified Trauma and Stressor Related Disorder and (2) Mild Neurocognitive Disorder;
>
> (8) Safeco required plaintiff to pay for a life care plan which estimated the future cost of plaintiff's permanent injuries at $696,469.81; and
>
> (9) Safeco's bonus structure ties employee compensation to reducing claim payouts and investigation costs[.]

[Doc. 69 at 14–15].

Pursuant to Syllabus Point 3 of ***Miller v. Fluharty***, 201 W.Va. 685, 500 S.E.2d 310 (1997):

> An insurance carrier has a duty, once a first-party policyholder has submitted proof of a loss, to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information. On the basis of that investigation, if liability to the policyholder has become reasonably clear, the insurance carrier must make a prompt, fair and equitable settlement offer.

Defendants contend Safeco's investigation of plaintiff's UIM claim was prompt and reasonable. [Doc. 68 at 17]. In support, defendants present Dr. Saar's testimony regarding

the differences between his report and Dr. Nussbaum's report. [Id. at 17–18]. Defendants utilize Dr. Saar's testimony to illustrate that their dispute regarding plaintiff's injuries and damages was in good faith and not the result of an unreasonable investigation. [Id. at 18]. Defendants also state that, upon receipt of Dr. Bowman's report, plaintiff's UIM claim was settled. [Id. at 19]. Defendants use this point to illustrate that, once information supporting a higher settlement offer was received, a higher settlement offer was made. [Id.]. Further, defendants contend plaintiff's deposition reveals her true issue is not with how her UIM claim was handled, but rather pertains to how UIM coverage works in West Virginia. [Id.].

In ***Raszkiewicz***, the Fourth Circuit states an underinsured motorist carrier "does not expect to be called upon to assist" in the investigation of a policyholder's underlying claim. 2025 WL 1177259, at *1. Rather, it is the role of the liability carrier to conduct the investigation, negotiation, and defense of claims "until its limits are exhausted." ***Id.*** Accordingly, a UIM carrier's duty to investigate a claim does not arise "until after the underlying . . . claim [is] settled for the tortfeasor's full policy limit." ***Id.*** at *2. It is at that point when the UIM carrier owes its insured "a duty to investigation [the] UIM claim and to make reasonable attempts at settlement." ***Id.*** (internal citation omitted).

Here, plaintiff provided relevant materials for defendants' consideration on September 26, 2022. [Doc. 68-3]. On October 27, 2022, Safeco offered to resolve the UIM claim for $4,000 based upon a review of the materials provided by plaintiff. [Doc. 68-9]. As stated herein, plaintiff's medical records indicated she was mostly healed from her accident-related injuries. Defendants were under no obligation to foresee reports of experts which did not exist. Upon receipt of additional reports regarding plaintiff's medical

status, the UIM claim was settled. This fact alone, and the testimony of Dr. Saar regarding the differentiation between his report and the report of Dr. Nussbaum, supports the notion that the $4,000 settlement offer was based on a good faith valuation of plaintiff's UIM claim, and not the result of an unreasonable investigation. For the same reasons, this Court does not believe this offer was a "lowball" offer.

As for the "typical jury award" standard, this Court notes defendants' argument that defendant Culbertson considered various factors in assessing the value of plaintiff's UIM claim. [Doc. 72 at 10]. Defendant Culbertson's deposition testimony reflects she considered materials a jury would consider in awarding a verdict, i.e., medical records, bills, and prior medical history. [Id. at 10–12]. Based upon defendant Culbertson's testimony, plaintiff's argument as to the "typical jury award" standard is without merit.

As for plaintiff's argument regarding the failure to refer her UIM claim to the complex claims division, this argument centers around a claimed traumatic brain injury. [Doc. 69 at 2]. As noted herein, plaintiff's medical records provided to Safeco reflect she was mostly healed from her accident-related injuries. As defendants put it, plaintiff's position regarding transfer to the complex claims division would have required Safeco to "utilize a crystal ball" to foresee additional claimed injuries. [Doc. 72 at 5]. The information available to Safeco at the time did not warrant transfer to the complex claims division. [Id. at 3–5]. Accordingly, plaintiff's argument on this point is without merit.

Plaintiff argues Safeco misrepresented the amount of plaintiff's medical specials it considered in making the $4,000 offer. [Doc. 69 at 3]. As noted herein, Safeco accepted $31,226.24 of plaintiff's submitted medical expenses. [Doc. 68-6]. Safeco attributes the rejected expenses to plaintiff's post-accident TMJ treatment. [Doc. 68 at 4]. A November

4, 2022 letter sent from defendant Culbertson to plaintiff's counsel states "$37K-$38K" of damages was considered in making the $4,000 offer. [Doc. 69-6 at 1]. Plaintiff argues that Aaron Pickel, Safeco's 30(b)(6) witness, acknowledged a misrepresentation of the amount of damages considered was contained in the letter. [Doc. 69 at 3]. Defendants argue Safeco made clear it was not accepting medical expenses relating to plaintiff's TMJ treatment, and that the "$37K-$38K" representation was accurate, as that was the amount of expenses with which Safeco began its evaluation of plaintiff's UIM claim. [Doc. 72 at 9].

This Court agrees with defendants' position. The November 4, 2022 letter makes clear that Safeco is not accepting plaintiff's expenses related to TMJ. [Doc. 69-6]. To call the expression of "$37K-$38K" of damages a misrepresentation is disingenuous, as that was the total amount of damages evaluated by Safeco in reviewing plaintiff's UIM claim. Accordingly, this Court does not believe the contents of the November 4, 2022 letter support plaintiff's claims.

Plaintiff argues Safeco ignored multiple findings within Dr. Saar's report. [Doc. 69 at 15]. Defendants argue clarification was requested regarding the contents of the report. [Doc. 72 at 13]. The email communications provided alongside defendants' Response illustrate Safeco did not ignore this report; rather, Safeco sought additional information regarding the report's contents. [Id.]; *see also* [Docs. 72-2–72-4]. Defendants, therefore, did not ignore the report, and this argument is without merit.

Plaintiff contends Safeco "required" her to pay for a life care plan from Dr. Bowman. [Doc. 69 at 15]. While plaintiff may be attempting to illustrate Safeco's alleged lack of investigation into the UIM claim, this argument seems misguided. Safeco certainly did not require plaintiff to pay for Dr. Bowman's report. Any requirement for plaintiff to pay for

Dr. Bowman's report would likely arise from her fee arrangement with counsel, not due to any act/omission on the part of Safeco or the other defendants.

Finally, plaintiff argues Safeco's bonus structure is tied to reducing claim payouts and investigation costs. [Doc. 69 at 15]. Defendants state this is not true; rather, Safeco's employees are trained to "pay what [Safeco] owe[s]." [Doc. 72 at 15–17]. The deposition testimony presented by defendants does not support the notion that Safeco ties adjuster compensation to claim payout or reducing the costs of investigations.

Accordingly, defendants are entitled to summary judgment on plaintiff's common law bad faith claim.

### D. Statutory Bad Faith

West Virginia recognizes a private right of action for a first-party claimant against their insurance company for violations of section 4 of the West Virginia Uniform Trade Practices Act ("UTPA"). *See, e.g.*, ***McCormick v. Allstate Ins. Co.***, 197 W.Va. 415, 475 S.E.2d 507 (1996). Unlike a ***Hayseeds***-type bad faith claim, it is not necessary for the claimant to substantially prevail on the underlying claim–rather, the policyholder need only resolve the underlying claim in their favor. ***McCormick***, 197 W.Va. at 427, 475 S.E.2d at 519. *See also* ***Maher v. Continental Cas. Co.***, 76 F.3d 535, 544 (4th Cir. 1996) ("Because West Virginia's ***Hayseeds*** jurisprudence does not apply to actions under § 33–11–4(9), we note that a plaintiff need not substantially prevail on an underlying policy claim in order to enforce his or her rights under the statute.").

Specifically:

> [t]o maintain a private action based upon alleged violations of W.Va. Code § 33–11–4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of W.Va. Code § 33–11–4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business practice" and can be distinguished by fair minds from an isolated event.

***Stonewall Jackson Mem'l Hosp. v. American United Life Ins. Co.***, 206 W.Va. 458, 465, 525 S.E.2d 649, 656 (1999). While the plaintiff must show "[m]ore than a single isolated violation of W.Va. Code § 33–11–4(9) . . . multiple violates of W.Va. Code § 33–11–4(9), occuring in the same claim [are] sufficient." ***United Bankshares, Inc. v. St. Paul Mercury Ins. Co.***, 2010 WL 4630212, at *6 (S.D. W.Va. 2010) (Goodwin, J.) (citations omitted). This section of the UTPA sets out a list of practices specific to claim settlement that are considered unfair or deceptive. *See, e.g.*, ***Romano v. New England Mut. Life Ins. Co.***, 178 W.Va. 523, 526, 362 S.E.2d 334, 337 n.3 (1987).

For similar reasons as already stated herein, defendants are entitled to summary judgment on plaintiff's statutory bad faith claim. Plaintiff's statutory bad faith claim centers

mostly around the same arguments as presented in support of the common law bad faith claim. [Doc. 69 at 17–22]. There are a few additional arguments, however, which will be addressed.

Plaintiff claims Safeco failed to "utilize any of the policy tools" and did not investigate her UIM claim. [Doc. 69 at 19]. As is evidenced by the record, Safeco did in fact investigate plaintiff's claim. Safeco evaluated the medical records and information provided to it by plaintiff, and this evaluation resulted in a $4,000 offer to resolve the UIM claim. Not even three (3) weeks after receiving the $4,000 offer, plaintiff filed suit. [Doc. 1-1]. As set forth herein, this Court believes Safeco's offer reflected the results of its investigation: medical records revealed plaintiff was mostly recovered from accident-related injuries. There is no mandate that an insurer conduct an independent medical examination; rather, an independent medical examination may be performed prior to the start of litigation "where the medical evidence before [an insurer] is not satisfactory to them." ***Dodrill v. Nationwide Mut. Ins. Co.***, 201 W.Va. 1, 15, 491 S.E.2d 1, 15 (1996). As for an examination under oath, this Court is unaware of any mandate that an insurer conduct such an examination. Accordingly, this argument does not support plaintiff's claim for statutory bad faith.

Further, this Court does not believe plaintiff's arguments in support of her statutory bad faith claim illustrate regulatory violations on the part of Safeco for reasons as stated herein. This matter simply arises from a good faith dispute as to claim value, not due to any ill conduct on the part of defendants. [Doc. 68 at 21]. Accordingly, defendants are entitled to summary judgment on plaintiff's statutory bad faith claim.

This Court agrees with defendants that plaintiff's claims against defendant Liberty Mutual Insurance Company ("Liberty Mutual") fail as a matter of law. Plaintiff was not in contract with Liberty Mutual. [Doc. 68 at 23–24]. While plaintiff argues defendant Culbertson represented herself to be an adjuster of both Safeco and Liberty Mutual, and that defendant Culbertson receives compensation pursuant to Liberty Mutual's bonus structure, this is not enough to illustrate a contractual relationship between plaintiff and Liberty Mutual. West Virginia law is clear: a breach of contract claim requires the plaintiff to be in contract with the defendant. ***Wilt v. Household Life Ins. Co.***, 2016 WL 5844485 (S.D. W.Va. Sept. 30, 2016) (Johnston, J.). Claims for common law bad faith and statutory bad faith flow from the existence of the insurance contract. *See* ***Grubbs v. Westfield Ins. Co.***, 430 F.Supp.2d 563, 567 (N.D. W.Va. 2006) (Keeley, J.) (no common law bad faith cause of action against insurance adjuster because adjuster was not party to an insurance contract); ***Smith v. Scottsdale Ins. Co.***, 40 F.Supp.3d 704, 714 (N.D. W.Va. May 16, 2014) (Seibert, M.J.) (no statutory bad faith cause of action where plaintiff is not in contract with insurance company). Accordingly, plaintiff's claims against Liberty Mutual cannot survive. It logically follows plaintiff cannot recover against defendant Culbertson under the UTPA.[3]

[3]Plaintiff acknowledges she is not pursuing breach of contract or common law bad faith claims against defendant Culbertson. [Doc. 74 at 22].

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment [**Doc. 67**] is **GRANTED**. Plaintiff's Motion for Summary Judgment [**Doc. 69**] is **DENIED**. The following Motions are **DENIED AS MOOT**:

1. Plaintiff's Motion *in Limine* No. 1 (Comparative Bad Faith) [**Doc. 79**];

2. Plaintiff's Motion *in Limine* No. 2 (Policy Limits) [**Doc. 80**];

3. Defendants' First Motion *in Limine* to Exclude the Opinions of Stuart Setcavage [**Doc. 86**];

4. Defendants' Second Motion *in Limine* to Exclude the Opinions of Timothy Saar [**Doc. 88**];

5. Defendants' Third Motion *in Limine* to Exclude Testimony Regarding Alleged Future Damages [**Doc. 90**];

6. Defendants' Fourth Motion *in Limine* to Exclude Testimony Regarding Policy Reformation [**Doc. 92**];

7. Defendants' Fifth Motion *in Limine* to Exclude the Opinions of Richard Bowman [**Doc. 95**];

8. Defendants' Sixth Motion *in Limine* to Exclude Post-Suit Settlement Discussions [**Doc. 98**]; and

9. Defendants' Seventh Motion *in Limine* to Exclude Reference to Liberty Mutual Insurance Company [**Doc. 102**].

The Clerk is **DIRECTED** to **ENTER JUDGMENT** for plaintiff in the amount of $25,000.00 on the breach of contract claim. Following tender of the settlement proceeds, the parties are **ORDERED** to submit a proposed dismissal order.

The **trial** set for June 17, 2025, and the **pretrial conference** set for June 9, 2025, are hereby **CANCELED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: June 5, 2025.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT COURT**